UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                :

In re REFCO CAPITAL MARKETS, LTD.    :         06 Civ. 643 (GEL)
BROKERAGE CUSTOMER SECURITIES    :
LITIGATION                          :        **OPINION AND ORDER**
                                :
------------------------------------------------------------x

Richard L. Stone and Mark A. Strauss, Kirby
McInerney & Squire, LLP, New York, New York,
for lead plaintiffs Global Management Worldwide
Limited, Arbat Equity Arbitrage Fund Limited, and
Russian Investors Securities Limited.

Jeffrey T. Golenbock and Adam C. Silverstein,
Golenbock Eiseman Assor Bell & Peskoe LLP,
New York, New York, for defendant Phillip R.
Bennett.

Michael T. Hannafan and Blake Tyler Hannafan,
Hannafan & Hannafan, Ltd., Chicago, Illinois; and
Norman L. Eisen and Laura E. Neish, Zuckerman
Spaeder LLP, New York, New York, for defendant
Tone N. Grant.

David E. Mollón, Winston & Strawn LLP, New
York, New York; Bruce Braun, Bradley Lerman,
and Linda T. Coberly, Winston & Strawn LLP,
Chicago, Illinois; and Margaret Maxwell Zagel and
Tracy W. Berry, Grant Thornton LLP, Chicago,
Illinois, for defendant Grant Thornton LLP.

Matthew J. Sava and Yoram Jacob Miller, Shapiro
Forman Allen Sava & McPherson LLP, New York,
New York, for defendants Joseph J. Murphy and
Gerald M. Sherer.

Stuart I. Friedman and Ivan Kline, Friedman &
Wittenstein, New York, New York, for defendant
William M. Sexton.

Holly Kay Kulka, Heller Ehrman LLP, New York,
New York, for defendant Philip Silverman.

Barbara Moses and Rachel Marissa Korenblat,
Morvillo, Abramowitz, Grand, Iason, Anello &
Bohrer, P.C., New York, New York, <u>for defendant
Robert C. Trosten</u>.

Greg A. Danilow and Paul Dutka, Weil, Gotshal &
Manges LLP, New York, New York, <u>for the THL
Defendants</u>.

GERARD E. LYNCH, District Judge:

In this securities class action, plaintiff customers of Refco Capital Markets, Ltd.

("RCM"), a securities brokerage, allege that corporate officers improperly lent assets from

customers' trading accounts to affiliated Refco companies.  This opinion addresses motions to

dismiss by various corporate officers, Refco's auditor Grant Thornton LLP, and a group of

defendants affiliated with Thomas H. Lee Partners, L.P. (the "THL Defendants"[1]) who

collectively owned a majority interest in Refco at the time of the alleged scheme.  Because

plaintiffs have failed to allege that defendants engaged in deceptive conduct, the motions to

dismiss will be granted; however, plaintiffs will be given leave to replead.

## BACKGROUND

This is one of a number of cases arising from the fiery implosion of the brokerage and

trading company Refco and its several affiliates.  <u>See</u> <u>Am. Fin. Int'l Group-Asia, L.L.C. v.</u>

<u>Bennett</u>, No. 05 Civ. 8988, 2007 WL 1732427 (S.D.N.Y. June 14, 2007); <u>In re Refco, Inc. Secs.</u>

---

[1] The "THL Defendants" are Thomas H. Lee Partners, L.P., Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P., THL Equity Advisors V, LLC, Thomas H. Lee Investors Limited Partnership, The 1997 Thomas H. Lee Nominee Trust, THL Refco Acquisition Partners, THL Refco Acquisition Partners II, THL Refco Acquisition Partners III, Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

Litig., No. 05 Civ. 8626, 2007 WL 1280649 (S.D.N.Y. Apr. 30, 2007) ("Refco I"); Thomas H.

Lee Equity Fund V, L.P. v. Bennett, No. 05 Civ. 9608, 2007 WL 950133 (S.D.N.Y. Mar. 28,

2007); In re Refco, Inc., No. 06 Civ. 1888, 2006 WL 1379616 (S.D.N.Y. May 16, 2006); Krys v.

Official Comm. of Unsecured Creditors of Refco Inc. (In re SPhinX, Ltd.), Nos. 06-11760, 06

Civ. 13215, __ B.R. __, 2007 WL 1965597 (Bankr. S.D.N.Y. Jul. 05, 2007).  The alleged

scheme at issue, however, is distinct from the schemes alleged in those cases.

## I.     The Alleged Scheme

Plaintiffs essentially allege that Refco improperly lent itself money from accounts

belonging to a subsidiary's customers.  The scheme involved a Refco subsidiary known as Refco

Capital Management Ltd. ("RCM"), a corporation organized under the laws of Bermuda with its

principal place of business in New York City.  (Compl. ¶ 17.[2])  RCM "purported to be an

offshore securities broker and foreign exchange broker," and was one of Refco's three principal

operating subsidiaries.  (Id.)

RCM advertised itself as an offshore brokerage, not subject to U.S. brokerage regulation.

(Id. ¶¶ 47, 72.)  According to the complaint, RCM specifically considered itself exempt from the

requirements of 17 C.F.R. § 240.15c3-1, which sets forth requirements involving the

maintenance of a certain quantity of net capital, and 17 C.F.R. § 240.15c3-3, which requires,

inter alia, that broker-dealers segregate certain customers' funds and securities.  (Compl. ¶¶ 47,

68.)  According to plaintiffs, RCM was a "sham entity" with no offices or employees of its own

and "no independent existence."  (Id. ¶ 73.)  All transactions on behalf of RCM were handled by

---

[2] All references or citations to the complaint in this opinion are to the Consolidated
Amended Class Action Complaint dated September 5, 2006, and filed on September 9, 2006.

employees of Refco Securities, LLC ("RSL"), another Refco affiliate.  (Id. ¶ 74.)  Plaintiffs

claim that RCM existed only on the books of other Refco entities, functioning entirely as a

device for the avoidance of U.S. securities laws (id. ¶ 73), and that because RCM had no

employees of its own, RSL employees in New York performed all essential tasks for RCM.  (Id.

¶ 56.)

Plaintiffs bring this action on behalf of a putative class of "all securities brokerage

customers" of RCM.  (Id. ¶ 39.)  The complaint does not explain exactly what services RCM

promised to perform for its "securities brokerage customers."  Nor does the complaint give any

details as to the procedures and agreements under which RCM normally handled customers'

assets or how, exactly, the alleged fraudulent mishandling of assets was accomplished.

The complaint alleges that "securities held by RCM on behalf of its customers were

secretly sold," and the "proceeds diverted" to other Refco entities.  (Id. ¶ 46).  The complaint

never explains how customers' assets were managed in the normal course of business, which

makes it difficult to understand what the word "diverted" means.  For example, the complaint

never explains whether the brokerage held securities on behalf of individual customers or pooled

customer assets to purchase securities.[3]  Similarly, the allegation that the securities were sold

_____

[3] Some aspects of the complaint suggest that RCM's customers assets were pooled to
purchase securities, as opposed to securities being held in the name of any particular customer.
RCM operated as an offshore brokerage purportedly not required to keep customers' assets
separate from the assets of other customers, or to maintain a minimum proportion of customer
assets in liquid accounts.  The complaint never expressly explains whether RCM did pool
customer assets, although certain allegations suggest it did.  When plaintiffs allege that RCM
lent "customer assets" (see, e.g., Compl. ¶ 58) to related Refco entities, they carefully avoid
alleging that the assets in question belonged to any particular RCM customer.  This suggests that
customer assets were not segregated.  Defendants, at least, appear to believe that assets were not
segregated.  (Officer Reply 13 n.10.)  The complaint also alleges that "[h]ad RSL properly
maintained RCM customer accounts in accordance with U.S. regulatory requirements, including

4

"secretly" suggests that RCM was under some obligation to seek prior authorization for or at least provide notice of the sale of the securities in question, but the complaint never explains the source of this obligation.  Without knowing anything about the terms of the agreements pursuant to which RCM held securities "on behalf of" its customers, it is difficult to know what uses of those securities would constitute an improper diversion of funds.

It appears that two sets of transactions are at issue in this case, although plaintiffs never make clear exactly which of the transactions constituted the alleged fraud.  The transactions were: (1) sales of securities held by RCM on customers' behalf, and (2) loans of the proceeds of those sales to affiliated Refco entities.  (Id. ¶¶ 49-51.)  Again, however, the complaint fails to explain what agreements, if any, governed RCM's ability to make such loans.  It is clear from the complaint that RCM was, in some circumstances, in the business of making loans; plaintiffs elsewhere complain that the loans to Refco affiliates failed to conform to RCM's standard loan procedures.  (Id. ¶ 55-58.)  The complaint does not explain, however, whether RCM was permitted to make loans using the assets of "securities brokerage customers."  Nor does it set forth the terms of the allegedly fraudulent loans themselves.  It does not explain, for example, to whom the Refco affiliates owed their debt.

The complaint alleges that the loans in question were made for the benefit of Refco officials, rather than for legitimate business purposes.  The transactions were allegedly initiated by "Refco senior management, including defendants Maggio and Bennett and other persons

---

the segregation rules, the fraudulent scheme alleged herein would not have been possible." (Compl. ¶ 78.)  If customer assets were pooled, then the loan from RCM to the Refco affiliates would have been a loan from the pool, rather than from the accounts of any particular customers. The complaint never alleges that customers were deceived or misled about whether assets would be pooled or maintained in segregated accounts.

acting on behalf of [Refco affiliates] Refco Global Finance, [Refco Capital LLC ("RCC")] and
Refco Group." These officers and others would communicate with RSL executives, who would
in turn sell the RCM securities and transfer the proceeds to Refco Global Finance and then to
RCC. (Compl. ¶¶ 49-50.) RCC would then disperse the funds wherever they were needed
within the Refco organization, often to Refco Group, for various uses, including payroll
payments and daily operations. (Id. ¶ 50-51.) The funds were also used to extend credit to
customers of Refco affiliates (id. ¶ 51), to pay down Refco's debts, and to fund acquisitions (id.
¶¶ 52-53). The complaint also alleges that the Refco affiliates that received the loans never
intended to repay them, and lacked the financial ability to repay them in any event. (Id. ¶ 57.)
Plaintiffs say that the proceeds from the sales of RCM customer assets were essential to Refco's
continued functioning; Refco's financial state was weak, and without the RCM customers'
money, it would have collapsed "long before it did." (Id. ¶ 48.)

     Plaintiffs also make a number of allegations pertaining to the process by which the loans
at issue were approved. Plaintiffs allege that the RSL executives responsible for the transfers
received substantial bonus payments for implementing these transactions; the bonus structure
was specifically designed to maximize the amount of RCM customer assets "monetized" and
"pushed upstream." (Id. ¶ 58.) They allege that no independent officer at RCM considered or
approved the loans; Maggio, a senior Refco Group officer, was the senior risk officer at RCM,
and RCM's board of directors, which was dominated by Bennett and Maggio, never considered
the loans. (Id. ¶ 55.) Because the complaint does not provide any information about the
agreements governing RCM's brokerage services, however, it is difficult to know what
procedures plaintiffs believe should have been applied.

The complaint alleges that the defendants "fraudulently mischaracterized" the transactions at issue as "loans" to RCM "customers" (id. ¶ 46) and that some of the transactions were "undocumented."  (Id. ¶ 50.)  It does not, however, explain what it means by the term "undocumented."  Elsewhere, the complaint alleges that "Refco management . . . kept track of the intercompany transactions and of the RCM customer funds that were available at any given time."  (Id. ¶ 161.)  It is not clear how management "kept track" of loans that were "undocumented."  Nor, again, does the complaint explain the procedures that plaintiffs believe should have been applied in documenting the loans to Refco affiliates.

Reading the complaint in context, it appears that when plaintiffs allege that the loans were "undocumented" or "fraudulently mischaracterized" as loans, they mean that the true nature of the transactions was not fairly reflected in Refco's books.  The complaint does not allege, for example, that Refco's books were altered to show fake counterparties for these transactions, or that the loans were made without any documentary record.  Instead, it alleges that the Refco affiliates who received the loans were inaccurately identified as "customers" of RCM.  (Id. ¶ 54.)  The complaint assets that Refco Global Finance, RCC, Refco Group, and the other Refco affiliates who received the proceeds of the sales could not fairly be considered RCM customers (id. ¶ 55), because the loans differed from loans to other customers in a variety of ways: the Refco affiliates were not evaluated for risk or creditworthiness; the transactions were made "without fair or any consideration" (by which plaintiffs may mean simply that the affiliates' promises to repay were not sincere; the complaint does not deny that promises to repay were made for each loan or claim that the loans were interest-free); the transactions were made without proper documentation or observation of corporate formalities (id. ¶ 55); and the recipient

7

affiliates were not required to post collateral, as would be the case with loans made in normal course.  Id.  The complaint also makes clear, however, that the transactions were identified as related-party transactions in Grant Thornton's audit report.  (Compl. ¶ 85b.)

According to the complaint, approximately $2.6 billion in RCM customer assets was missing when Refco filed for bankruptcy on October 17, 2005.  (Id. ¶ 46.)  As noted above, however, plaintiffs do not say from where the assets were missing, that is, whether the missing money should have been available as cash, as debt, as securities held by RCM for individual customers, as securities held on behalf of a pool of customers, or in some other form.

The alleged scheme at issue in this case took place against a background familiar from other Refco cases, in which another fraud, the revelation of which eventually caused Refco's collapse, was ongoing.  The complaint mentions, but does not discuss in depth, the allegation (central to other Refco actions) that Refco's management devised a scheme to hide the fact that several of Refco's significant assets had been rendered worthless by the Asian financial crisis of the late 1990s.  (Compl. ¶ 4.)  The details of this alleged scheme have been discussed in other cases.  See Refco I, 2007 WL 1280649, at *1-*2.  Essentially, to hide their worthless assets, Refco's management allegedly devised a "round-robin" scheme in which the uncollectible receivables were transferred onto the books of Refco Group Holdings, Inc. ("RGHI"), a non-party Refco affiliate.  Then, another Refco subsidiary would lend money to a third party, which would in turn lend it to RGHI to pay down the uncollectible receivables, effectively erasing them from Refco's books.  These transactions would happen shortly before the end of each relevant financial period, and be "unwound" shortly after the reporting period was over.  See id.  Nothing in the complaint suggests that the two frauds were directly connected; there is no allegation, for

example, that proceeds from the sale of RCM customer assets were used in the circular transactions at issue in the round-robin fraud.[4]  The only apparent connection is that both schemes were designed to hide financial problems at Refco and its affiliates from the public and from investors.

## II.    Refco's Collapse

Refco Inc. went public in an initial public offering ("IPO") on August 11, 2005.  Nine weeks later, on October 10, 2005, Refco issued a press release announcing that it had discovered an "undisclosed affiliate transaction" involving a hidden receivable in the amount of $430 million owed to Refco by RGHI.  The release explained that RGHI had assumed obligations owed by third parties to Refco, "which may have been uncollectible."  Refco disavowed its financial statements for fiscal years 2002, 2003, and 2004.  (Compl. ¶ 60.)  The circular transactions had been publicly revealed, but the alleged fraud involving the RCM customer accounts had not.

After the public disclosure of the circular fraud, RCM customers began attempting to withdraw assets from their accounts.  On October 13, 2005, citing liquidity concerns, Refco announced that it was imposing a 15-day moratorium on trading activity at RCM, including withdrawals.  (Compl. ¶ 62.)  On October 17, 2005, Refco and some of its subsidiaries filed for bankruptcy.  (Id. ¶ 63.)  See In re Refco Inc., et al., No. 05-60006 (RDD) (S.D.N.Y. Bankr.).  In

---

[4] Allegations by the plaintiffs in Refco I suggest that the money used in the round-robin fraud originated at RCM.  According to the plaintiffs in that case, funds in the round-robin fraud were allegedly paid by "Refco Capital" to a third party, which would then loan them to RGHI so that RGHI could temporarily pay down the uncollectible receivables.  Refco I, 2007 WL 1280649, at *1-*2.  The entity referred to by the Refco I plaintiffs as "Refco Capital" is apparently RCM.  See Refco I Compl. ¶ 25; but see Refco I, 2007 WL 1280649, at *31 n.31 (noting that at least one defendant raises an issue as to the identity of "Refco Capital").

bankruptcy proceedings, Refco acknowledged that RCM owes its customers approximately $4.16 billion, but has only $1.905 billion in assets.  (Compl. ¶¶ 65, 67.)  A substantial part of this debt is intercompany debt owed to RCM by other Refco affiliates, including Refco Global Finance and Refco Group.  (Id. ¶ 66.)

### III.   Defendants

Because it is unnecessary to reach the various questions unique to individual defendants at this time, the roles played by the various defendants in Refco and RCM can be summarized briefly.  Defendants Tone N. Grant, Joseph J. Murphy, William M. Sexton, Gerald M. Sherer, Philip Silverman, Robert C. Trosten, and Phillip R. Bennett were corporate officers of Refco and/or RCM.  (Compl. ¶¶ 22-30.)  Defendant Grant Thornton was RCM's auditor.  (Compl. ¶ 38.)  It provided auditing services in connection with RCM's financial statements for the fiscal years ending in February 2003, 2004 and 2005.  Each year, Grant Thornton issued unqualified audit opinion letters attesting that those financial statements fairly presented RCM's financial condition in accordance with Generally Accepted Accounting Principles ("GAAP") and that its audits had been conducted in accordance with Generally Accepted Auditing Standards ("GAAS").  (Compl. ¶ 79.)

The THL Defendants were, at the relevant times, majority owners of Refco.  In June 2004, one year prior to the IPO, the THL Defendants purchased a 57% equity stake in Refco for approximately $507 million.  (Id. ¶ 133.)  Plaintiffs allege that defendant Thomas H. Lee Partners was at all times authorized to act for and on behalf of all of the other THL Defendants. (Id. ¶ 134.)  After the IPO, the THL Defendants continued to hold a dominant 44% interest.  (Id. ¶ 143.)

**DISCUSSION**

The complaint must be dismissed because it fails sufficiently to allege deceptive conduct. Defendants raise a number of other issues in their motions to dismiss, including whether plaintiffs have adequately alleged loss causation (Joint Mem. of Defs. Grant, Murphy, Sexton, Sherer, Silverman, and Trosten ("Officer Mem.") 16), whether any deceptive scheme was properly alleged "in connection with" the sale of securities (Bennett Mem. 9), whether plaintiffs allege acts by Grant Thornton in furtherance of the scheme, whether plaintiffs have adequately alleged scienter, whether plaintiffs have stated a claim for control person liability against the THL Defendants and defendants Bennett, Grant, Trosten, and Maggio, and whether the class allegations should be stricken for various reasons.  Since the complaint must be dismissed for failure to allege deceptive conduct, it is not necessary to reach these arguments at this time. Accordingly, the complaint will be dismissed with leave to replead, and defendants' other arguments will be addressed if and when plaintiffs file an amended complaint that satisfactorily alleges deceptive conduct.

**I.      Standards for Motions to Dismiss**

Under the notice pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The Supreme Court recently reconsidered the standard for motions to dismiss in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), in the wake of which courts are to apply "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible."  Iqbal v. Hasty, 490 F.3d 143, 158 (2d

Cir. 2007).  Under this standard, a complaint may be dismissed where it fails to plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S.Ct. at 1974.  "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 1965 (internal quotation marks omitted).  In order to state a claim, the factual allegations "must be enough to raise a right to relief above the speculative level." Id.  Where a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Id. at 1974.

It remains true, however, that "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the claim is and the grounds upon which it rests." Erickson v. Pardus, 127 S. Ct. 2197, 2200 (2007) (internal alteration, citations and quotation marks omitted).  As always, the court must "accept[ ] all factual allegations in the complaint and draw[ ] all reasonable inferences in the plaintiff's favor." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

As a threshold matter, it should be noted that three motions to dismiss in this case — by defendants Silverman, Sexton, and Murphy and Sherer — are not opposed by plaintiffs. Although these motions were properly served on plaintiffs, plaintiffs' opposition papers do not address or mention these defendants' motions at all.  Accordingly, plaintiffs have abandoned their claims against those defendants, whose motions to dismiss will be granted on that basis. See George v. Ford Motor Co., No. 03 Civ. 7643, 2007 WL 2398806, at *7 (S.D.N.Y. Aug. 17, 2007) ("Defendant does not even attempt to rebut these objections, and thus appears to abandon its request."); Shady Records, Inc. v. Source Enter., 371 F. Supp. 2d 394 (S.D.N.Y. 2005)

("whether [plaintiff's] claims had merit is now moot in light of [its] willingness to abandon those claims.")  As plaintiffs have entirely failed to defend their complaint, or to suggest that they could amend the complaint to cure the defects asserted by these defendants, leave to replead as against these defendants will not be granted.

## II.    <u>Deceptive Conduct</u>

### A.    <u>Deceptive Conduct Must Be Alleged</u>

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a <u>et seq.</u>, provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

The U.S. Securities and Exchange Commission (the "SEC") adopted a number of rules pursuant to Section 10(b), most notably Rule 10b-5, 17 C.F.R. § 240.10b-5, which provides that it is unlawful

> (a) [t]o employ any device, scheme or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Id.  "[C]ourts long have held that a private right of action was indeed created" by Section 10(b) and Rule 10b-5. Ontario, 369 F.3d at 31.

Subsections (a) and (c) of Rule 10b-5 prohibit the use of "any device, scheme, or artifice to defraud" or participation "in any act, practice, or course of business" that would perpetrate fraud on investors.  The elements of a claim under Rule 10b-5(a) and (c) have been stated in different ways by courts in this district.[5]  No matter how the test is stated, however, one element is that plaintiffs must allege conduct that is "manipulative or deceptive."  In re Parmalat Secs. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005); see In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004).  Indeed, the most basic element of all fraud claims is that the victim must be deceived by the perpetrator's words or actions.  See id. at 335 ("a cause of action exists under subsections (a) and (c) for behavior that constitutes participation in a fraudulent scheme, even absent a fraudulent statement by the defendant.").

Claims under Rule 10b-5(a) and (c) "sound in fraud and therefore come within Rule 9(b). The plaintiffs therefore must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."  Parmalat, 383 F. Supp. 2d at 622.

---

[5] Compare In re Parmalat Secs. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005) (stating that plaintiff must allege that defendant "(1) committed a deceptive or manipulative act, (2) with scienter, that (3) the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendants' actions caused the plaintiffs' injuries.") with In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004) ("All that is required in order to state a claim for a primary violation under Rule 10b-5(a) or (c) is an allegation that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance.").

In securities cases, there are several kinds of cognizable deception.  The most obvious is misleading statements or material omissions, which are proscribed by Rule 10b-5(b).  Another is market manipulation, which is proscribed by Rule 10b-5(a) and (c).  The gravamen of a market manipulation claim is that defendants' actions convey to investors, via the market (which, absent manipulation, would produce a price that fairly reflects the value of securities), a false sense of a security's value.  ATSI Commc'ns, 493 F.3d at 101.  In other words, instead of deceiving investors by making false statements, fraudsters in market-manipulation cases deceive investors by causing the market to make their false statements for them.

Another kind of securities fraud claim is based on conduct that is deceptive because it is inconsistent with a fiduciary duty.  In claims of this kind, the fiduciary duty serves as a sort of standing false representation by the fraudster, who deceives the victim by violating the commitment associated with her fiduciary duty.  Acceptance of a fiduciary duty creates an understanding that the fiduciary will behave in certain ways; if the fiduciary allows this understanding to continue while acting inconsistently with her obligations, she has deceived the victim.  See SEC v. Zandford, 535 U.S. 813, 821 (2002).  A fiduciary duty is not a required element of a deceptive conduct claim in cases where there is some conduct or representation that gives the victim the relevant false impression.  Thus, in a market manipulation case, there is no need to show a fiduciary relationship, ATSI Commc'ns, 493 F.3d at 101, because the false impression is the misleading share price created through manipulative market activity.  The point is that there must be some conduct or representation by the fraudster that deceives the victim — that is, the defendant's conduct must create in the victim a sense that things are otherwise than they are.

15

### B.      Plaintiffs Have Not Alleged Deceptive Conduct

Plaintiffs make various allegations of wrongdoing or mishandling of assets, but they fail to explain how defendants created a false impression concerning their handling of plaintiffs' assets.  The apparent basis of plaintiffs' claim is deceptive conduct, rather than market manipulation.[6]  But it is not clear how plaintiffs believe they were deceived.

In general, it is difficult to understand the complaint's allegations regarding use of customer assets, because the complaint never explains how those assets were held.  For example, the complaint alleges that RCM would sell customer' securities in whatever amount was needed to raise the cash Refco needed (Compl. ¶ 49), and refers to "[s]ecurities held by RCM on behalf of its customers" (id. ¶ 46), but it never explains whether those securities were held in RCM's name or the customers' name.  Nor does it ever describe the understanding pursuant to which RCM held customer assets.  The complaint alleges that the sales of RCM customer assets "occurred without the knowledge, authorization or consent of plaintiffs and the class."  (Compl. ¶ 49.)  Authorization, of course, is not required for all brokerages making trades on behalf of a client; some brokerages hold assets on a discretionary basis, meaning that they are permitted to make trades without the client's specific authorization.  The complaint does not explain whether

---

[6] Plaintiffs do not contend that the complaint alleges a market manipulation claim, as it clearly does not.  Market manipulation is a "term of art" that "refers to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."  Kemp v. Universal Am. Fin. Corp., No. 05 Civ. 9883, 2007 WL 86942, at *16 (S.D.N.Y. Jan. 10, 2007) (internal citations and quotation marks omitted).  The defendants' alleged use of customers' assets was designed to help finance Refco's coverup of its financial problems, and thereby keep the stock price artificially high.  It did not do so, however, by affecting the market in which Refco securities were traded.  On the contrary, all of the alleged activity was meant to be kept secret.

the accounts were discretionary.  Nor does it describe any other aspect of the agreements between RCM and its customers.

In order to coherently allege deceptive conduct, plaintiffs must identify (1) the source of the understanding falsely created by defendants (that is, a fiduciary duty, prior representation, or some other reason why they believed defendants would act otherwise than they did), and (2) conduct that violated that understanding.  The complaint does neither.

Plaintiffs allege that defendants schemed to "steal" their money when they lent customer funds to other Refco entities.  (Pl. Mem. 8.)  This is a legal conclusion, not a factual allegation, and plaintiffs do little to explain what about the use of RCM customers' assets constituted theft, much less what would have made any such theft deceptive.  Use of assets could not constitute theft if it was authorized, and since plaintiffs never set forth the terms of the agreements pursuant to which those assets were held, or even allege that any agreement was violated by RCM's use of the assets, it is impossible to accept the conclusory contention that RCM stole customers' assets.

More importantly, it is necessary to identify the sense in which the conduct was deceptive, as opposed to merely untoward.  Not all thefts constitute fraud; only if the theft breaches some representation, explicit or implicit, can it be said to be deceptive.  Theft not accomplished by deception (e.g., physically taking and carrying away another's property) is not fraud absent a fiduciary duty.  See United States v. Finnerty, 474 F. Supp. 2d 530, 543 (S.D.N.Y. 2007).  Stealing a stranger's car, for example, does not deceive the victim; it merely deprives him of his car.  Even if plaintiffs had adequately alleged that customers' assets were stolen, nothing in the complaint explains what about the theft was deceptive.

Plaintiffs rely primarily on <u>Zandford</u>, in which the Supreme Court held that a broker who sold a client's shares for his own profit had engaged in actionable deceptive conduct.  In that case, however, there was a fiduciary duty between the clients and the broker; thus, each sale "was deceptive because it was neither authorized by, nor disclosed to, the [clients]."  535 U.S. at 821.  "[E]ach time respondent 'exercised his power of disposition for his own benefit,' that conduct, 'without more,' was a fraud."  <u>Id</u>., quoting <u>United States v. Dunn</u>, 268 U.S. 121, 131 (1925).  The conduct was deceptive because the victims "were duped into believing respondent would 'conservatively invest' their assets in the stock market and that any transactions made on their behalf would be for their benefit for the 'safety of principal and income.'"  535 U.S. at 821.  That is, the victims believed, on the basis of the perpetrator's specific representations and the fiduciary duty he owed them, that their money would be handled in a certain way.

<u>Zandford</u> does not help plaintiffs' case because plaintiffs do not say whether they believe that defendants owed them any fiduciary duty or how defendants' conduct was inconsistent with representations made to plaintiffs.  <u>See generally</u> <u>Stewart v. J.P. Morgan Chase & Co.</u>, No. 02 Civ. 1936, 2004 WL 1823902, at *12 (S.D.N.Y. 2004) ("The courts have consistently held that where a brokerage client has a self-directed account, the broker ordinarily has no legal responsibilities beyond the prompt and accurate carrying out of any transaction directed by the client."); <u>De Kwiatkowski v. Bear, Stearns & Co., Inc.</u>, 306 F.3d 1293, 1305-06 (2d Cir. 2002) (discussing special circumstances in which brokers may have more extensive duties).  If RCM had the discretion to trade in customer assets, then the central issue in this case is whether the loans were bad investments that violated a fiduciary duty.  If RCM had no such discretion, then the central question is whether RCM deceptively made unauthorized trades.  Thus, plaintiffs'

18

failure to make clear whether a fiduciary duty existed is significant, because the case will present different questions depending on the answer to that question.

Nor did RCM ever suggest, like the fraudsters in <u>Zandford</u>, that it would "conservatively invest" plaintiffs' money.  On the contrary, the only representation mentioned in the complaint is RCM's representation that it was an offshore brokerage not subject to U.S. regulations.  Far from suggesting deception, that representation would appear to put customer on notice that the accounts would be managed in unconventional ways.  The terms of the complaint make clear that plaintiffs were aware when they invested with RCM that RCM intended to engage in conduct that would ordinarily be unlawful under U.S. regulations if RCM were a U.S. broker. Refco publicly described RCM as not subject to requirements that brokerages segregate customer funds and maintain sufficient capital to operate safely.  (Compl. ¶¶ 68, 72.)  Whether RCM was actually permitted by U.S. regulations to engage in that conduct is beside the point; what matters is that plaintiffs were well aware it intended to do so.[7]  Plaintiffs never identify any requirement to which RCM claimed it would adhere that prohibited brokerages from using customer assets for loans to affiliated companies.  The complaint therefore provides no reason why plaintiffs could reasonably have expected RCM not to use their assets in the manner it did. Even if the loans to Refco affiliates constituted extremely bad or even self-interested management, nothing in the complaint explains how they were deceptive.  Unlike <u>Zandford</u>, in

---

[7] Plaintiffs contend that RCM was, contrary to its representations, subject to U.S. brokerage regulation.  (Pl. Mem. 13-14; Compl. ¶ 77.)  This matters not at all, because whether RCM was actually allowed by law to engage in the activities in question has nothing to do with whether those activities were deceptive.  Authorized bad conduct is not fraud.  If RCM had advertised with a sign saying "Invest With Us, and We'll Flush Your Money Down The Toilet," plaintiffs could not claim fraud when the company then did exactly what it had promised, even if the flushing was illegal.

short, there is no apparent sense in which the conduct alleged contravened some prior understanding or broker's duty.

Aside from the failure to identify the source of the prior understanding that was violated, the complaint also fails to explain what aspect of the transactions — or, indeed, which transactions — violated their understanding as to how their assets would be treated. In other words, the complaint does not explain what aspect of any specific action was deceptive. Was it the unauthorized sale of plaintiffs' assets that was fraudulent, or the decision to use the resulting funds for self-interested and unprofitable ends? Either of these theories, or some other, might suffice to allege deceptive conduct.[8] But it is impossible to analyze other issues, such as scienter, without knowing what deceptive act plaintiffs see as the heart of the fraud and whether that deception was premised on a fiduciary duty or a prior representation. Defendants are entitled to know "what deceptive or manipulative acts were performed" and in what sense they were deceptive. Parmalat, 383 F. Supp. 2d 622.

Plaintiffs allege that "the purported 'loans' made by RCM were uncollectible because the Refco affiliates to which the loans were made lacked the financial ability and intention to repay them." (Compl. ¶ 57.) This allegation, which is unsupported by any other details, lacks the supporting allegations that would "nudge [plaintiffs'] claims across the line from conceivable to plausible." Twombly, 127 S. Ct. at 1974.

The complaint uses strong, unqualified language ("the Refco affiliates . . . lacked the

---

[8] It is difficult to imagine that self-dealing loans to insolvent affiliates could be consistent with any fiduciary duty; nor does it seem likely that RCM made any disclosure that would have rendered permissible the making of self-interested loans to entities known to be insolvent, because no investor would give money to a company that announced its plan to use some of the pool of customer assets for self-dealing loans to insolvent affiliate companies.

financial ability and intention to repay") that seems to suggest that *no* Refco affiliate intended to repay *any* of the RCM loans. With respect to ability to repay, the complaint does not clearly allege that every Refco entity that borrowed from RCM was insolvent.  It could perhaps be inferred that the reason for the inability to repay was the round-robin fraud, and therefore that the Refco officers involved in the round-robin fraud knew that the affiliates could not repay RCM or its customers.  That would be quite a leap to make, however, from the terms of the complaint's allegations, which simply state in blanket terms that "the Refco affiliates" lacked the ability to repay.  The complaint never alleges that all Refco affiliates were rendered insolvent by the round-robin fraud; nor does it allege any basis for the broad, unqualified contention that the Refco affiliates were unable to pay the RCM loans.  If plaintiffs really mean that all of the RCM loans were uncollectible, they have failed to support their claim with sufficient supporting allegations; if, on the other hand, they mean that some of the loans at issue were uncollectible, their failure to specify which loans makes it impossible for defendants or the Court to tell which transactions are alleged to be fraudulent.

With respect to intent to repay, it is difficult to determine the basis for plaintiffs' allegation that the affiliates lacked the intent to repay, which could mean any number of things. For example, it might mean that Refco officers devised a scheme pursuant to which the RCM customer assets would be "borrowed" from a pool of RCM customer assets, used for Refco affiliates' own business purposes, and never replaced.  This would presumably be deceptive whether plaintiffs alleged a fiduciary duty or a violation of the terms of their brokerage agreements.  On the other hand, the complaint might be read to mean that Refco officers allowed the loans to take place knowing that Refco was in such financial trouble that any debt it incurred

might become uncollectible.  This would be quite a different matter from taking out a loan with the specific intent never to repay it.

Importantly, the complaint also fails to explain which of the defendants in this case, if any, knew that the affiliates were insolvent or lacked the intent to repay.  Nor does it identify the specific officers at the borrower affiliates who lacked the intent to repay. Thus, plaintiffs have identified neither the party who deceived them nor the act by which they were deceived nor the circumstances that made it deceptive.

The complaint also does not explain to whom the loans *should* have been repaid.  It is impossible to understand what conduct plaintiffs claim was deceptive without understanding which entities were parties to the allegedly fraudulent loan agreements and whose money was loaned to the Refco affiliates.  If customer assets were pooled, the alleged fraud might be significantly different than a fraud in which a broker sells a client's assets for his own benefit. RCM operated as an offshore brokerage, purportedly permitted to maintain net asset levels without regard to the minimum levels established in U.S. brokerage regulation.  If customer assets were pooled to purchase securities, therefore, the complaint suggests that customers were warned that not all customer funds would be committed to the securities RCM held on customers' behalf.  The simple fact that RCM was eventually left without significant assets to allow its customers to withdraw all funds from their accounts is not necessarily indicative of fraud — plaintiffs point to no specific agreement under which they had a right to expect that pooled funds would be invested in any particular way, or guaranteed against loss, or available for immediate withdrawal by customers.  Nor do plaintiffs point to any agreement of which they were aware under which defendants were obliged to return funds to the RCM pooled account at

any particular time.  Using pooled funds for self-interested purposes with no possibility of profit for plaintiffs would likely be a violation of a fiduciary duty, if one existed.  But that would be a very different kind of fraud than a fraud involving the making of unauthorized trades from specific nondiscretionary accounts.  Defendants are entitled to know which kind of fraud they are alleged to have committed.

Other aspects of the allegedly fraudulent transactions are described in the complaint, but in each case plaintiffs fail to explain what understanding was violated by those transactions or what false impression was created by them.  The complaint alleges, for example, that the intercompany transfers in question were "not recorded on Refco's general ledger as they should have been."  (Compl. ¶ 54.)  The phrase "should have been" here has no referent.  Plaintiffs allege that the loans were mischaracterized as loans to customers, but they support this argument only by arguing that Refco affiliates were treated differently than other recipients of loans from RCM; nothing in the complaint explains why plaintiffs expected Refco affiliates would not receive loans in this fashion.  If plaintiffs had been induced by defendants to believe that transactions would be recorded in a certain way, then an allegation of deceptive conduct might be stated, but in the absence of any allegations regarding the understanding pursuant to which plaintiffs' assets were held, this is insufficient.[9]

In short, the complaint fails to make sufficient allegations as to deception, the most basic element of fraud.  Accordingly, there is no need to reach the defendants' other arguments

---

[9] Moreover, the complaint acknowledges that loan statements were issued, showing "the indebtedness and interest that the entities owed to RCM" (Compl. ¶ 54), and says that Refco management "kept careful track of the intercompany transactions."  (Id. ¶ 59.)  It is not clear how this fits with plaintiffs' contention that the loans were not properly documented.

pertaining to other elements of fraud, or the arguments relating to control liability, because no

primary violation of the securities laws has been alleged.  See Refco I, 2007 WL 1280649, at *18

(noting that control liability claims must allege a primary violation).[10]

## IV.   **Leave to Replead**

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to replead should

be "freely given when justice so requires."  Fed. R. Civ. P. 15(a).  Leave to replead may be

denied if repleading would be futile, Acito v. IMCERA Group, Inc., 47 F.3d 47, 55 (2d Cir.

1995), but it is far from clear that repleading would be futile here.  As noted above, several

different potential fraudulent schemes could be hypothesized within the vague contours of

plaintiffs' allegations.  Given the opportunity to explain what conduct by defendants was

deceptive, plaintiffs may be able to point to some specific duty or action on defendants' part that

created the requisite false impression.  Plaintiffs have not previously sought to amend (their first

---

[10] Similarly, the parties' arguments concerning standing are difficult to resolve given the
vagueness of the current complaint.  Defendants rely on the line of cases holding that to have
standing, plaintiffs must have purchased securities in a company that made qualifying
misstatements.  See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 754-55 (1975)
(holding that individuals who *failed* to purchase a stock due to a company's misrepresentation of
its value did not have standing to sue, because they were not purchasers or sellers of the
security); Ontario Pub. Svc. Employees Union Pension Trust Fund v. Nortel Networks Corp.,
369 F.3d 27, 33 (2d Cir. 2004) (holding that plaintiffs who purchased the securities of a company
that did not make the misstatements at issue did not have standing to sue, even if they purchased
securities in a company that had a close business relationship with that company).  Defendants
contend that "[a] deposit of securities with a brokerage firm is a bailment, not a sale, and cannot
support a Rule 10b-5 claim even if induced by fraud."  (Officer Mem. 8.)  In response, plaintiffs
contend that they were "unwitting sellers of securities" (Pl. Mem. 16).  The complaint is so
vague with regard to the arrangements by which RCM held plaintiffs' securities that it is difficult
to determine whether this argument has merit.  Defendants also argue that plaintiffs have no
standing because they have failed to identify any specific securities owned by plaintiffs that were
sold by defendants.  (Officer Mem. 10 n.5.)  If customer accounts were pooled, as discussed
below, it would be impossible to identify specific customers' assets sold by RCM.

amendment was as of right), and granting leave to amend would not prejudice defendants, since the case is still at an early stage.

Moreover, developments in related cases may allow all parties to benefit from repleading. After the instant motions were fully submitted, plaintiffs forwarded to the Court copies of complaints in two related cases filed by Marc S. Kirschner, the trustee appointed to bring certain claims associated with the Refco bankruptcy by the U.S. Bankruptcy Court for the Southern District of New York.  See Kirschner v. Grant Thornton LLP, et al., No. 2007L008818 (Cir. Ct. Cook County, Aug. 21, 2007), and Kirschner v. Bennett et al., No. 07602896 (N.Y. Sup. Ct. N.Y. County, Aug. 27, 2007).  Plaintiffs request that "the Court take judicial notice of the judicial admissions" contained in these complaints.  (See Letter from Mark A. Strauss, Esq., to the Court, dated Sept. 7, 2007; Letter from Mark A. Strauss, Esq., to the Court, dated Aug. 28, 2007.)  Under the doctrine of judicial admissions, factual assertions made in a pleading bind the party filing the pleading to those assertions, see Gibbs v. CIGNA Corp., 440 F.3d 571, 578 (2d Cir. 2006), but plaintiffs do not explain how it could be relevant to preclude Kirschner, who is not a party to this litigation, from contradicting any particular claim in this case.  Plaintiffs do not indicate any desire to incorporate factual allegations made in Kirschner's complaints into their own allegations.  Repleading will allow the plaintiffs to examine these new filings to determine whether they wish to incorporate Kirschner's allegations into their own complaint.

Along with these new complaints, two recent opinions by this Court in Refco-related cases were issued after the filing of the instant motions.  In Refco I, 2007 WL 1280649, and Am. Fin. Int'l Group-Asia, L.L.C. v. Bennett, 2007 WL 1732427, this Court addressed a number of the same issues and facts raised in this complaint and the resulting motions.  For example, many

of the same allegations in support of scienter used in Refco I are also used in this case with respect to the same defendants. (Compare Refco I, 2007 WL 1280649, at *25-*33, with Compl. ¶¶ 160-188.) It may be helpful to all parties for plaintiffs to replead their claims with the benefit of the standards and analysis set forth in those opinions, because each side will be better able to frame its arguments if it does so with an awareness of the standards the Court will apply.

Accordingly, leave to replead will be granted as to the defendants other than those as to whom plaintiffs' claims have been abandoned.

## CONCLUSION

For the foregoing reasons, the joint motion to dismiss by defendants Tone N. Grant, Joseph J. Murphy, William M. Sexton, Gerald M. Sherer, Philip Silverman, and Robert C. Trosten (Doc. # 46), and the motions to dismiss by defendants William M. Sexton (Doc. #49), Joseph J. Murphy and Gerald M. Sherer (Doc. # 54), Grant Thornton, L.L.P. (Doc. # 57), Phillip R. Bennett (Doc. # 59), the THL Defendants (Doc. # 62), and Phillip Silverman (Doc. # 68) are granted.

Leave to replead is granted as to all defendants except defendants Silverman, Sexton, Murphy and Sherer. Accordingly, the Clerk of the Court is respectfully directed to mark the case closed as to those defendants.

Plaintiffs are directed to advise the Court by October 8, 2007, as to whether they intend to file an amended complaint. If so, the parties (with the exception of those defendants finally dismissed from the case) are directed to meet and confer regarding a schedule for the filing of an amended complaint and subsequent motions to dismiss, and submit a stipulated schedule, or competing proposed schedules, to the Court by October 22, 2007.

SO ORDERED.

Dated: New York, New York
     September 13, 2007

GERARD E. LYNCH
United States District Judge

27