UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
                                                                 :
In re REFCO CAPITAL MARKETS, LTD.                                :
BROKERAGE CUSTOMER SECURITIES                                    :          06 Civ. 643 (GEL)
LITIGATION                                                       :
                                                                 :
-----------------------------------------------------------------x
                                                                 :
VR GLOBAL PARTNERS, L.P. <u>et al.</u>,                          :
                                                                 :
                              <u>Plaintiffs</u>,                 :
                                                                 :
           - against-                                            :          07 Civ. 8686 (GEL)
                                                                 :
PHILLIP R. BENNETT <u>et al.</u>,                                :
                                                                 :
                              <u>Defendants</u>.                 :
                                                                 :
-----------------------------------------------------------------x          **OPINION AND ORDER**
                                                                 :
CAPITAL MANAGEMENT SELECT FUND                                   :
LTD. <u>et al.</u>,                                              :
                              <u>Plaintiffs</u>,                 :
                                                                 :
           - against-                                            :          07 Civ. 8688 (GEL)
                                                                 :
PHILLIP R. BENNETT <u>et al.</u>,                                :
                                                                 :
                              <u>Defendants</u>.                 :
                                                                 :
-----------------------------------------------------------------x

Scott A. Edelman, Sander Bak, Michael Shepherd,
Milbank, Tweed, Hadley & McCloy LLP, New
York, New York, <u>for Lead Plaintiffs and the</u>
<u>Prospective Class, VR Plaintiffs, and Capital</u>
<u>Plaintiffs</u>.

Mark A. Strauss, Richard L. Stone, Kirby
McInerney & Squire LLP, New York, New York,
<u>for Lead Plaintiffs and the Prospective Class</u>.

Norman L. Eisen, Laura E. Neish, Zuckerman
Spaeder LLP, New York, New York, and
Blake T. Hannafan, Michael T. Hannafan, Hannafan
& Hannafan, Ltd., Chicago, Illinois, for defendant
Tone N. Grant.

David E. Mollón, Bradley E. Lerman, Catherine W.
Joyce, Linda T. Coberly, Winston & Strawn LLP,
New York, New York, and Chicago, Illinois, and
Margaret Maxwell Zagel, Kenneth Cunningham,
Grant Thornton LLP, Chicago, Illinois, for
defendant Grant Thornton LLP.

Matthew J. Sava, Yoram J. Miller, Jason Vigna,
Shapiro Forman Allen & Sava LLP, New York,
New York, for defendant Joseph J. Murphy.

Stuart I. Friedman, Ivan O. Kline, Elizabeth
Meacham, Friedman & Wittenstein, New York,
New York, for defendant William M. Sexton.

Lawrence J. Zweifach, Richard Cashman, Eric
Creizman, Heller Ehrman LLP, New York, New
York, for defendant Philip Silverman.

Barbara Moses, Rachel Korenblat, James Darrow,
Morvillo, Abramowitz, Grand, Iason, Anello &
Bohrer, P.C., New York, New York, for defendant
Robert C. Trosten.

Richard A. Rosen, Paul Weiss, Rifkind, Wharton &
Garrison LLP, New York, New York, and Greg A.
Danilow, Weil, Gotshal & Manges LLP, New York,
New York, for the THL Defendants.

GERARD E. LYNCH, District Judge:

On September 13, 2007, this Court dismissed the securities fraud complaint in the

putative class action, In re Refco Capital Markets, Ltd. Brokerage Customer Securities

Litigation, No. 06 Civ. 643, 2007 WL 2694469, at *12-13 (S.D.N.Y. Sept. 13, 2007) (hereinafter

"RCM I"), for failure to allege deceptive conduct, but granted Lead Plaintiffs leave to replead as to certain defendants. Thereafter, two groups of plaintiffs brought individual actions based on allegations substantially similar to those advanced by Lead Plaintiffs in the putative class action. See VR Global Partners, L.P. et al. v. Bennett et al., No. 07 Civ. 8686 (GEL) (S.D.N.Y. filed Oct. 9, 2007); Capital Mgmt. Select Fund Ltd. et al. v. Bennett et al., No. 07 Civ. 8688 (GEL) (S.D.N.Y. filed Oct. 9, 2007). On November 20, 2007, the Court consolidated all three actions for pretrial purposes. Lead Plaintiffs in due course filed a Second Amended Complaint in the putative class action.

This opinion addresses fifteen motions to dismiss filed in the consolidated actions by various former corporate officers of Refco,[1] Refco's auditor Grant Thornton LLP, and a group of defendants affiliated with Thomas H. Lee Partners, L.P. (the "THL Defendants"), who collectively owned a majority interest in Refco at all times relevant to the pending actions. Because plaintiffs lack standing to assert their claims for securities fraud and, in any event, fail to allege deceptive conduct, the motions to dismiss will be granted in their entirety, and plaintiffs' request for leave to replead will be denied with prejudice.

## BACKGROUND

The initial discussion of background facts will be brief, as the facts are fully set forth in the Court's prior opinion in RCM I. Detailed discussions of relevant factual allegations will be reserved for the legal analyses that require them.

---

[1] The term "Refco" is used in this opinion to refer to both Refco Group Ltd. and its successor parent-level entity, Refco Inc., as well as their direct and indirect subsidiaries.

## I.    The Parties

Plaintiffs in the consolidated actions are all former customers of Refco Capital Markets, Ltd. ("RCM"), a Refco subsidiary that operated as a securities brokerage firm.  In the putative class action, Lead Plaintiffs Global Management Worldwide Limited, Arbat Equity Arbitrage Fund Limited, and Russian Investors Securities Limited are "commonly controlled investment funds" who represent a prospective class of RCM customers who "placed securities with or held securities at" RCM (and/or its sister company Refco Securities, LLC ("RSL")) at any time from October 17, 2000, to October 17, 2005, and elected to contribute the proceeds of their claims to the Refco Private Action Trust (collectively, the "Class Plaintiffs").[2]  (P. Mem. 9; Class Compl. ¶¶ 2, 34-38.[3])  In the <u>VR Global</u> action, plaintiffs VR Global Partners, L.P., Paton Holdings,

---

[2] As plaintiffs explain in their opposition brief:

> The Refco Private Action Trust was established by the Refco Bankruptcy Plan.  Under the Plan, most of Refco's creditors, including RCM customers, assigned their claims (except for securities law claims) against third parties to the Refco Private Action Trust.  To the extent those creditors, including RCM customers, had securities law claims against third parties, those creditors assigned the proceeds of their individual Refco-related securities causes of action to the Refco Private Action Trust.  In return for those assignments, participants received beneficial interests in the Refco Private Action Trust entitling them to a share of the proceeds of any assigned causes of action.  The overwhelming majority of RCM customers — including the Class Action Plaintiffs[, the VR Plaintiffs, and the Capital Plaintiffs] — elected to make such a contribution.

(P. Mem. 9 n.19.)

[3] Unless otherwise noted, references to the Class Complaint in this opinion are to the Second Amended Complaint filed by Lead Plaintiffs in the putative class action.  (Doc. # 114, 06 Civ. 643.)

Ltd., VR Capital Group Ltd., and VR Argentina Recovery Fund, Ltd. (collectively, the "VR Plaintiffs") describe themselves as "one of the top-ranked emerging markets funds in the world, achieving a 43% annual compound return for its investors, net of fees, over its six year existence prior to the Refco debacle." (VR Compl. ¶ 81.) Plaintiffs in the Capital Management Action, Capital Management Select Fund Ltd., Investment & Development Finance Corporation, and IDC Financial S.A., are offshore investment funds incorporated in the Bahamas, British Virgin Islands, and Panama respectively (collectively, the "Capital Plaintiffs"). (Capital Compl. ¶¶ 31-33.)

Various former corporate officers of Refco and/or RCM are named as defendants in the consolidated actions (collectively, the "Officer Defendants").[4] Defendant Grant Thornton LLP, RCM's auditor, is sued only in the VR Global action. Grant Thornton provided auditing services in connection with RCM's financial statements for the fiscal years ending in February 2003, 2004, and 2005, and issued unqualified audit opinion letters for each of those fiscal years. (VR Compl. ¶ 78.) The THL Defendants are entities or individuals affiliated with defendant Thomas H. Lee Partners, L.P., a private equity firm.[5] (Class Compl. ¶¶ 54-62; VR Compl. ¶¶ 69-77;

_____

[4] In the putative class action, the term "Officer Defendants" refers to Bennett, Maggio, Grant, Trosten, and Outridge. (Class Compl. ¶ 48.) In the Capital Management action, Grant is not included as an Officer Defendant, but Murphy, Sexton, and Silverman are. (Capital Compl. ¶ 43.) See RCM I, 2007 WL 2694469, at *6 (dismissing Murphy, Sexton, and Silverman from the putative class action with prejudice). In the VR Global action, all eight individuals referenced above are named as Officer Defendants. (VR. Compl. ¶ 60.) (See Trosten Mem. 6 n.5.) With the exception of defendants Bennett and Maggio, who have filed answers to the complaints, all of the Officer Defendants have moved to dismiss the consolidated actions. (P. Mem. 1 n.4.)

[5] The "THL Defendants" are Thomas H. Lee Partners, L.P., Thomas H. Lee Advisors LLC, THL Managers V, LLC, THL Equity Advisors V, LLC, Thomas H. Lee Equity Fund V, L.P., Thomas H. Lee Parallel Fund V, L.P., Thomas H. Lee Equity (Cayman) Fund V, L.P.,

Capital Compl. ¶¶ 51-59.)  In August 2004, one year prior to Refco's initial public offering

("IPO"), the THL Defendants purchased a 57% equity stake in Refco for approximately $507

million.  (Class Compl. ¶ 56; VR Compl. ¶ 71; Capital Compl. ¶ 53.)  After the IPO, the THL

Defendants continued to hold a dominant 43% interest in Refco.  (Class Compl. ¶ 62; VR

Compl. ¶ 77; Capital Compl. ¶ 59.)

## II.    The Alleged Scheme

As noted in <u>RCM I</u>, the fraud alleged in the RCM customer actions is distinct from the

fraudulent scheme alleged in the Refco shareholders' class action and related cases, <u>see</u>, <u>e.g.</u>, <u>In</u>

<u>re Refco, Inc. Secs. Litig.</u>, 503 F. Supp. 2d 611, 618-20 (S.D.N.Y. 2007); <u>Thomas H. Lee Equity</u>

<u>Fund V, L.P. v. Grant Thornton LLP</u>, No. 07 Civ. 8663, 2008 WL 3166536, at *1-2 (S.D.N.Y.

Aug. 6, 2008), which involved the purported manipulation of Refco's financial condition through

a "round-robin fraud" designed to erase a massive uncollectible receivable from Refco's books

at the end of each financial reporting period, <u>RCM I</u>, 2007 WL 2694469, at *1, *4.  Plaintiffs in

the pending actions allege a separate scheme in which RCM allegedly sold customer assets

without authorization and improperly used the proceeds to make loans and fund the business

operations of other Refco affiliates.[6]  (Class Compl. ¶ 5; VR Compl. ¶ 5; Capital Compl. ¶ 4.)

---

Thomas H. Lee Investors Limited Partnership, The 1997 Thomas H. Lee Nominee Trust,
Thomas H. Lee, David V. Harkins, Scott L. Jaeckel, and Scott A. Schoen.

[6] Although the VR Complaint describes RCM's involvement in each of these two
schemes (<u>see</u> VR Compl. ¶ 182), nothing in any of the complaints suggests that the two frauds
were directly connected; "there is no allegation, for example, that proceeds from the sale of
RCM customer assets were used in the circular transactions at issue in the round-robin fraud."
<u>RCM I</u>, 2007 WL 2694469, at *4.

In particular, plaintiffs allege that they each opened non-discretionary trading accounts at RCM, which meant that any transactions made by RCM on their behalf required their advance approval. (Class Compl. ¶ 4; VR Compl. ¶ 4; Capital Compl. ¶ 3.) According to plaintiffs, RCM routinely sold, hypothecated, or pledged their securities without their authorization in violation of their customer agreements with RCM and in contravention of oral representations made by Refco representatives that RCM would hold their securities for safekeeping. (See Class Compl. ¶¶ 8, 10; VR Compl. ¶¶ 8,10; Capital Compl. ¶¶ 7, 9.) Plaintiffs contend that they were misled by RCM's monthly account statements and trade confirmations, which purportedly failed to disclose RCM's sales of their securities. (Class Compl. ¶ 11; VR Compl. ¶¶ 11, 105; Capital Compl. ¶ 10.) Plaintiffs also allege that RCM owed them a fiduciary duty and that its unauthorized sale of their assets breached that duty. (Class Compl. ¶ 9; VR Compl. ¶ 9; Capital Compl. ¶ 8.)

On October 10, 2005, just two months after its IPO, Refco disclosed that it had discovered a receivable in the amount of $430 million due from an entity controlled by Refco's CEO, Philip R. Bennett. As a result, the company announced that its financial statements for the preceding four years could no longer be relied upon. On October 17, 2005, Refco and many of its subsidiaries, including RCM, filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Code. (Class Comp. ¶¶ 152-54; VR Compl. ¶¶ 236-38; Capital Compl. ¶¶ 155-57.)

Following Refco's disclosure of the $430 million receivable, many RCM customers, including plaintiffs, attempted to "withdraw securities and funds that they entrusted to RCM." (Class Compl. ¶ 153; VR Compl. ¶ 237; Capital Compl. ¶ 156.) Refco responded by imposing a

moratorium on all withdrawals from RCM customer accounts. (Class Compl. ¶ 153; VR Compl. ¶¶ 237-38; Capital Compl. ¶ 156.) In bankruptcy proceedings, RCM acknowledged that it owes its customers approximately $4.16 billion, but has only $1.905 billion in assets. (Class Compl. ¶¶ 156-57; VR Compl. ¶¶ 240-41; Capital Compl. ¶¶ 159-60.) RCM also disclosed that "the majority of RCM's customer property had been transferred to other Refco entities . . . through a series of intercompany 'loans.'" (Class Compl. ¶ 156; VR Compl. ¶ 240; Capital Compl. ¶ 159.) As a result of RCM's allegedly deceptive conduct, plaintiffs purportedly suffered hundreds of millions of dollars in losses. (See Class Compl. ¶ 28; VR Compl. ¶ 28; Capital Compl. ¶ 25.)

## III. Claims

All of the complaints allege that defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934. 15 U.S.C. §§ 78j(b), 78t(a). Specifically, Count I of all complaints asserts claims under § 10(b) and Rule 10b-5(a) and (c) against the Officer Defendants and the THL Defendants. 17 C.F.R. § 240.10b-5. Count I of the VR Complaint also pleads claims against Grant Thornton LLP for alleged violations of Rule 10b-5(a)-(c). Id. Count II of all complaints sues the Officer Defendants for purported violations of § 10(b) and Rule 10b-16. Id. § 240.10b-16. Finally, Count III of all complaints alleges § 20(a) control liability claims against both the Officer Defendants and the THL Defendants.

## DISCUSSION

## I.     Motion to Dismiss Standard

Under the notice pleading standard set forth in Rule 8(a) of the Federal Rules of Civil Procedure, complaints must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court reconsidered the standard for motions to dismiss in Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955 (2007), in the wake of which courts are to apply "a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original). Under this standard, a complaint may be dismissed where it fails to plead "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974. "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65 (internal quotation marks and alteration omitted). In order to state a claim, the "factual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965. Where a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." Id. at 1974.

When deciding a 12(b)(6) motion, the Court must take as true the facts as alleged in the complaint and draw all reasonable inferences in the plaintiff's favor. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). "General, conclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint." Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1092 (2d Cir. 1995).

In addition, where a complaint alleges fraud, Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The pleading must be sufficiently particular to serve the three goals of Rule 9(b), which are (1) to provide a defendant with fair notice of the claims against him or her; (2) to protect a defendant from harm to reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of "strike suits." DiVittorio v. Equidyne Extractive Indus., 822 F.2d 1242, 1247 (2d Cir. 1987). Accordingly, where the fraud is based on alleged misrepresentations, the complaint must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir. 2001), quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989). A plaintiff pleading fraud based on deceptive conduct "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." In re Parmalat Secs. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2006).

## II. Rule 10b-5 Claims

### A. Standing

A plaintiff's standing to sue is necessarily the first inquiry, as "standing is at heart 'a jurisdictional prerequisite to a federal court's deliberations.'" Thompson v. County of Franklin, 15 F.3d 245, 248 (2d Cir. 1998), quoting Hodel v. Irving, 481 U.S. 704, 711 (1987). Although

§ 10(b) and Rule 10b-5 do not expressly provide for private rights of action,[7] courts since 1946 have sustained the existence of this right.  See Kardon v. National Gypsum Co., 69 F. Supp. 512, 514 (E.D. Pa. 1946); see also Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 13 n.9 (1971); Ontario Pub. Serv. Employees Union Pension Trust Fund v. Nortel Networks, Inc., 369 F.3d 27, 30-31 (2d Cir. 2004).  Subsequent caselaw read an "actual purchaser or seller" standing limitation into claims brought under § 10(b) and Rule 10b-5, see Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), and the Birnbaum rule was adopted by the Supreme Court as a bright-line rule in Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975). Exhaustively analyzing the policy arguments for and against the Birnbaum rule, the Court

---

[7] Section 10(b) of the Securities Exchange Act of 1934 provides that:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . (b) [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  The Securities and Exchange Commission ("SEC") adopted a number of rules pursuant to § 10(b), most notably Rule 10b-5, which provides that it is unlawful

> (a) [t]o employ any device, scheme or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

concluded that, on balance, retaining the rule, in its "straightforward application," was an appropriate and desirable limitation on the private right of action under § 10(b) and Rule 10b-5. Id. at 755. The Court specifically rejected a "shifting and highly fact-oriented disposition of the issue of who may bring a damages claim for violation of Rule 10b-5" and stated that such an approach would not be "a satisfactory basis for a rule of liability imposed on the conduct of business transactions." Id. The "purchaser or seller" standing rule of Blue Chip Stamps has since been reaffirmed hundreds of times. See, e.g., Ontario, 369 F.3d at 31-32.

Plaintiffs contend that RCM's sales of their securities, which allegedly occurred without their knowledge or authorization, nevertheless sufficed to make them "actual . . . sellers of securities" for purposes of satisfying the Birnbaum rule. Blue Chip Stamps, 421 U.S. at 731. (P. Mem. 43.) To support this contention, plaintiffs cite the Second Circuit's decision in Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002), which held that an equity investor had standing to bring a Rule 10b-5 claim against Citibank when he alleged that Citibank executed physical trades for his account without his authorization.[8] Id. at 323. The Court of Appeals remarked that "it is well-settled that claims under Rule 10b-5 arise when brokers purchase or sell securities on their clients' behalf without specific authorization," and cited cases brought under Rule 10b-5 for unauthorized trading, "which occurs when a broker intentionally places trades without obtaining the customer's approval," and churning, "which depend on a broker's liability for excessive trading." Id. at 323-24, citing, inter alia, Securities Inv. Prot. Corp. v. Vigman, 803 F.2d 1513,

_____

[8] The plaintiff investor in Caiola agreed to enter into "synthetic" transactions with Citibank to hedge his risk and to avoid leaving a "footprint" on the market indicating his trading strategies. Caiola, 295 F.3d at 315-16. Instead of carrying out these synthetic transactions, Citibank allegedly used the investor's funds to execute physical trades for his account contrary to his instructions. Id. at 323.

1519 (9th Cir. 1986) (unauthorized trading claim under Rule 10b-5), and Armstrong v. McAlpin,

699 F.2d 79, 91 (2d Cir. 1983) (observing that "[c]hurning, in and of itself, may be a deceptive

and manipulative device under section 10(b)").  Relying heavily on Caiola, plaintiffs contend

that RCM's unauthorized sale of their securities likewise made them "sellers of securities" for

purposes of satisfying the Birnbaum rule.  Blue Chip Stamps, 421 U.S. at 731.

As defendants point out, however, the Court of Appeals expressly noted that the "key

fact" in its decision was that the complaint alleged that the broker's transactions, though

unauthorized, "were made *on [plaintiff's] behalf*."  Id. at 324 (emphasis added).  Indeed, the

unauthorized trading and churning cases cited in Caiola all involve transactions undertaken by

the broker for the customer's account.  In contrast, all three complaints in the pending actions

specifically allege that RCM sold plaintiffs' securities without authorization *for RCM's own

benefit* by "us[ing] the proceeds to finance Refco's daily operations, trading losses and

significant acquisitions."[9]  (Class Compl. ¶ 5; VR Compl. ¶ 5; Capital Compl. ¶ 4.)

Although plaintiffs acknowledge that RCM sold their securities for its own benefit, they

argue that it would be an anomalous result to allow a customer to bring a Rule 10b-5 claim

where a broker makes unauthorized trades for the customer's benefit, but to deny standing where

the broker makes unauthorized trades for the broker's own benefit — "[i]n both cases, the

---

[9] In a footnote in their sur-reply brief, plaintiffs suggest that the very fact that RCM sold their property — regardless of whether the sales were made on their behalf or for RCM's own benefit — is sufficient to make them "sellers" under the Birnbaum rule.  (P. Sur-reply Mem. 7 n.19.)  Although Caiola does make passing mention to the fact that Citibank "purchased physical shares and options with [plaintiff's] funds," as explained above, the Court of Appeals made explicitly clear that for purposes of Rule 10b-5 standing, the "*key fact* is that [plaintiff] has alleged that the purchases *were made on his behalf*."  295 F.3d at 324 (emphasis added); see id. at 323 (holding that purchaser-seller requirement is met where plaintiff "adequately alleges that [the broker] bought physical stock *on [his] behalf* and *for his account*" (emphasis added)).

customer has been defrauded and injured through the unauthorized purchase and sale of the customer's securities." (P. Sur-reply Mem. 7 n.19.) In adopting the Birnbaum rule, however, the Supreme Court itself recognized that the bright-line purchaser-seller requirement, strictly applied, would exclude certain classes of potential plaintiffs who may have legitimate claims of injury from Rule 10b-5 violations. See Blue Chip Stamps, 421 U.S. at 739. This Court has similarly noted that "proper application of the [purchaser-seller rule] for standing to sue will undoubtedly prevent some otherwise meritorious claims from surviving motions to dismiss." MBIA Ins. Corp. v. Spiegel Holdings, Inc., No. 03 Civ. 10097, 2004 WL 1944452, at *6 (S.D.N.Y. Aug. 31, 2004).

Plaintiffs' own theory of the fraudulent scheme, moreover, necessarily defeats their claim of standing. Each of the complaints specifically alleges that plaintiffs' securities were first "stolen" by RCM, and then sold for the benefit of RCM and other Refco affiliates. (Class Compl. ¶¶ 4-5; VR Compl. ¶¶ 4-5; Capital Compl. ¶¶ 3-4; see P. Mem. 10 ("Plaintiffs' securities were stolen from [their] accounts.").) In contrast to cases of unauthorized trading and churning, then, which involve the unwitting purchase or sale of securities by a customer (effectuated by the broker on the customer's behalf), plaintiffs' allegations here establish only a theft and subsequent sale of customer securities by RCM for its own benefit. (See Grant Thornton Reply Mem. 3.) Such allegations simply do not demonstrate that plaintiffs themselves were "actual . . . sellers of securities" under the Birnbaum rule. Blue Chip Stamps, 421 U.S. at 731.[10]

_____

[10] Plaintiffs' citation to SEC v. Zandford, 535 U.S. 813 (2002), is inapposite because the Supreme Court's holding in that case interpreted the "in connection with" language of § 10(b), id. at 819, which is entirely distinct from the purchaser-seller standing requirement. See Ontario, 369 F.3d at 34 (observing that "the issue of standing" should not be conflated "with the question of whether the 'in connection with' requirement ha[s] been met"); see also Merrill Lynch, Pierce,

In sum, even assuming *arguendo* that some or all of the defendants violated § 10(b) and

Rule 10b-5, in the absence of any allegation that plaintiffs themselves were "actual purchasers

[or] sellers of securities," Blue Chip Stamps, 421 U.S. at 730, plaintiffs lack standing to seek a

private remedy for those violations. Accordingly, plaintiffs' Rule 10b-5 claims against all

defendants must be dismissed.[11]

B.    Deceptive Conduct

Even if plaintiffs could establish standing to bring their Rule 10b-5 claims, those claims

would still be dismissed because plaintiffs have again failed to adequately allege deceptive

conduct. Subsections (a) and (c) of Rule 10b-5 prohibit the use of "any device, scheme, or

artifice to defraud" or participation "in any act, practice, or course of business" that would

perpetrate fraud on investors. 17 C.F.R. § 240.10b-5(a) & (c). As RCM I explained, "[t]he

elements of a claim under Rule 10b-5(a) and (c) have been stated in different ways by courts in

this district," but "[n]o matter how the test is stated, . . . one element is that plaintiffs must allege

conduct that is 'manipulative or deceptive.'"  2007 WL 2694469, at *7, citing Parmalat, 383 F.

Supp. 2d at 622; In re Global Crossing, Ltd. Secs. Litig., 322 F. Supp. 2d 319, 336 (S.D.N.Y.

_____

Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 84 (2006) (noting that "[t]he limitation on standing
to bring [a] private suit for damages for fraud in connection with the purchase or sale of
securities is unquestionably a distinct concept from the general statutory and regulatory
prohibition on fraud in connection with the purchase or sale of securities" (alterations in
original)).

    [11] The VR Plaintiffs' Rule 10b-5(b) misrepresentation claim against Grant Thornton,
which is based on the alleged misstatements in the RCM and Refco financial statements, must be
dismissed for the additional reason that the VR Plaintiffs have not alleged any purchase or sale
of any RCM or Refco securities. See Ontario, 369 F.3d at 32 (noting that "the purchaser-seller
requirement . . . 'limits the class of plaintiffs to those who have at least dealt in the *security to
which the . . . representation, or omission relates*,'" quoting Blue Chip Stamps, 421 U.S. at 747
(emphasis added)).

2004). Claims under Rule 10b-5(a) and (c) "sound in fraud and therefore come within Rule 9(b). The plaintiffs therefore must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." Parmalat, 383 F. Supp. 2d at 622.

As in RCM I, the basis for plaintiffs' Rule 10b-5 claims in the pending actions is deceptive conduct, rather than market manipulation. See RCM I, 2007 WL 2694469, at *8 & n.6. Specifically, plaintiffs base their claims of deceptive conduct solely on RCM's alleged unauthorized sale of their securities.[12] "In order to coherently allege deceptive conduct, plaintiffs must identify (1) the source of the understanding falsely created by defendants (that is, a fiduciary duty, prior representation, or some other reason why they believed defendants would act otherwise than they did), and (2) conduct that violated that understanding." Id. Plaintiffs contend that defendants created a false impression concerning RCM's handling of their assets through both affirmative acts and misrepresentations and through RCM's failure to fulfill a fiduciary duty it owed to them. Neither contention is persuasive.

---

[12] In RCM I, the Court observed that "the complaint does not explain what aspect of any specific action was deceptive. Was it the unauthorized sale of plaintiffs' assets that was fraudulent, or the decision to use the resulting funds for self-interested and unprofitable ends?" RCM I, 2007 WL 2694469, at *10; see id. at *2 ("It appears that two sets of transactions are at issue in this case, although plaintiffs never make clear exactly which of the transactions constituted the alleged fraud. The transactions were: (1) sales of securities held by RCM on customers' behalf, and (2) loans of the proceeds of those sales to affiliated Refco entities."). In their opposition brief, plaintiffs "mak[e] clear that the fraud lies in the unauthorized sale of Plaintiffs' assets. Thus, while the Complaints do allege that the purported loans that RCM made to its affiliates with the proceeds of the misappropriated securities were uncollectible, that uncollectibility is not a necessary element of the pleaded fraud. . . ." (P. Mem. 106.)

1.    <u>Affirmative Deception</u>

Plaintiffs allege numerous ways in which RCM's and defendants' representations and
conduct purportedly gave them a false understanding concerning RCM's handling of their
securities.  Each of these alleged grounds of affirmative deception is discussed below.

a.    <u>Customer Agreement</u>

When opening their brokerage accounts with RCM, plaintiffs entered into a standard-
form "Securities Account Customer Agreement" with RCM (the "Customer Agreement").
(Class Compl. ¶ 95; VR Compl. ¶ 106; Capital Compl. ¶ 100).  Section A of the Customer
Agreement, which provides authorization to RCM to effectuate securities transactions on the
customer's behalf, states in relevant part:

> A.    <u>AUTHORIZATION</u>
>
> 1.    ***Authority to Act.***  You hereby authorize [RCM] to
> purchase, sell, borrow, lend, pledge or otherwise transfer
> Financial Instruments (including any interest therein) for
> your account in accordance with your oral or written
> instructions. . . .   Except to the extent you have expressly
> authorized someone else to buy, sell and otherwise effect
> Transactions on your behalf and for your account, all
> Transactions introduced to [RCM] by RSL on your behalf
> and entered into pursuant to this Agreement shall be
> initiated orally or in writing by you. . . .

(Rosen Decl. Ex. B.)  Section A thus made clear that plaintiffs' accounts at RCM were non-
discretionary.[13]

---

[13] Preliminarily, plaintiffs contend that RCM's sale of their securities violated Section A,
"which requires that customer securities only be dealt with pursuant to express customer
instructions."  (P. Mem. 27.)  As explained above, however, RCM sold plaintiffs' securities for
its own benefit and thus did not effectuate those transactions on plaintiffs' behalf for their
accounts.  <u>See</u> <u>supra</u> at 13.  RCM's use of plaintiffs' securities was thus entirely compatible with
Section A, which concerned only transactions that were for or on behalf of the customer.

Section B of the Customer Agreement, which governs margin transactions, provides in relevant part:

B.    MARGIN

This Margin section applies in the event [RCM] finances any of your Transactions from time-to-time in Financial Instruments.

1.    ***Security Interest.***  [RCM] reserves the right to require the deposit or maintenance of collateral (consisting of cash, United States government obligations or such other marketable securities or other property which may be acceptable to [RCM]) to secure performance of your obligations to [RCM]. . . . *To secure your obligations under Transactions entered into pursuant to this Agreement, you hereby grant to [RCM] and its affiliates (collectively, "Refco Entities") a first priority, perfected security interest in all of your cash, securities and other property* (whether held individually or jointly with others) and the proceeds thereof from time-to-time in the possession or under the control of such Refco Entities, whether or not such cash, securities and other property were deposited with such Refco Entities. . . . .

2.    ***Rights and Use of Margin.***  *[RCM] shall have the right to loan, pledge, hypothecate or otherwise use or dispose of such cash, securities, and other property free from any claim or right, until settlement in full of all Transactions[14] entered into pursuant to this Agreement.*  [RCM]'s sole obligation shall be to return to you such cash, like amounts of similar cash, securities and other property (or the cash value thereof in the event of any liquidation of collateral) to the extent they are not deemed to be collateral to secure Transactions entered into pursuant to this Agreement with any Refco Entities or have not been applied against obligations owing by you to Refco Entities, whether as a

---

[14] Although the Section B of the Customer Agreement refers to "all Transactions," defendants concede that "settlement in full of all Transactions" refers to settlement of a customer's *margin* transactions.  (THL Mem. 20.)

> result of the liquidation of positions and any Transactions
> entered into pursuant to this Agreement or otherwise. . . .

(Rosen Decl. Ex. B (emphasis added).)

Plaintiffs contend that "when Sections A and B are read together, the only reasonable interpretation of the Customer Agreements is that RCM could use customers' securities only as collateral against a loan balance when the customer engaged in margin or other financing." (P. Mem. 22.) According to plaintiffs, then, RCM engaged in deceptive conduct in contravention of the parties' understanding under the Customer Agreement in two ways: (1) by using customer securities in excess of the value of a customer's margin balance (id. at 23 n.66), and (2) by using customer securities even when those securities were fully paid — i.e., when no margin or deficit balance existed in the customer's account (id. at 22).

With regard to plaintiffs' first claim of deceptive conduct, defendants point to Section B of the Customer Agreement, which explicitly granted RCM "a first priority, perfected security interest in *all* of [a margin customer's] cash, securities and other property," and authorized RCM "to loan, pledge, hypothecate or otherwise use or dispose of such cash, securities, and other property free from any claim or right" until the customer repaid the margin loan. (Rosen Decl. Ex. B (emphasis added).) Defendants also cite Paragraph 1 of RCM's standard-form Trade Confirmation, which similarly granted RCM a security interest in "all" of a margin customer's assets and gave RCM "the right to sell, pledge, hypothecate, assign, invest or use, such collateral or property deposited with it." (Id. Ex. A.)[15] Plaintiffs' contention that RCM engaged in

---

[15] Paragraph 1 of RCM's standard-form Trade Confirmation provides:

> You hereby grant to RCM and its affiliates (collectively, "Refco
> Entities") a first priority, perfected security interest in all of you[r]

deceptive conduct by using customer securities in excess of the value of a customer's margin balance is thus directly belied by the express terms of the Customer Agreement and Trade Confirmation, which, taken together, authorized RCM to "use or dispose of" "all" of a customer's property (id. Ex. B) — whether that property was collateral against a margin balance, or "other [non-collateral] property" (id. Ex. A) — whenever a margin loan was outstanding in the customer's account.[16]

_____

cash, securities and other property (whether held individually or jointly with others) and the proceeds thereof from time-to-time in the possession or under the control of such Refco Entities which is being held by Refco Entities, for discharge of obligations however arising, whether or not such cash, securities, and other property were deposited with such Refco Entities. RCM does not segregate any collateral or other property deposited with it and RCM shall have the right to sell, pledge, hypothecate, assign, invest or use, such collateral or property deposited with it.

(Rosen Decl. Ex. A.) Although plaintiffs argue that RCM's trade confirmations "are not appropriately considered on this motion" because they "are not discussed or referenced in the Complaints" (P. Mem. 26), defendants correctly note that each of the complaints expressly refers to RCM's trade confirmations. (See Class Compl. ¶ 142; VR Compl. ¶¶ 105, 170; Capital Compl. ¶ 145.) The VR Plaintiffs, moreover, specifically allege that they relied on the representations in "the RCM-issued . . . trade confirmations" in deciding to deposit its securities with RCM. (VR Compl. ¶ 105.) See In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) ("In deciding a Rule 12(b)(6) motion, the Court may consider . . . documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint.").

[16] Plaintiffs suggest that during a trial in the Refco bankruptcy proceedings, In re Refco, Inc. et al., No. 05-60006 (RDD) (Bankr. S.D.N.Y.), Judge Drain rejected the interpretation of the Customer Agreement urged by defendants. (P. Mem. 23-24.) The issue before Judge Drain, however, was not whether RCM could use customer securities, but rather, whether RCM's customers had entered into an "entrustment" of property with RCM under the Bankruptcy Code (Rosen Decl. Ex. C., at 245:16.) If such an "entrustment" had occurred, RCM's customers would qualify as "customers" and RCM would qualify as a "stockbroker" for purposes of §§ 741(2) and 101(53A), respectively, of the Bankruptcy Code. (THL Mem. 8.) Contrary to plaintiffs' suggestion, Judge Drain's ruling that RCM customers had entrusted securities to RCM in no way undermines defendants' contention that under the Customer Agreement, RCM could

20

Plaintiffs' second claim of deceptive conduct based on the Customer Agreement fares no better. Although plaintiffs argue that RCM violated the Customer Agreement by using their securities even when no margin or deficit balance existed in their accounts, none of the allegations in the complaints suffices to establish that RCM actually "use[d] or dispose[d]" of plaintiffs' property at a time when they had no margin loans outstanding.[17] (Rosen Decl. Ex. B.)

use any or all securities in the account of a customer with margin loans. Indeed, Judge Drain observed that entrustment of securities can occur by "parties who have margin accounts and engage in financing activities . . . with a stockbroker" (Rosen Decl. Ex. C., at 245:22-24), thus indicating that entrustment can occur even when the broker is entitled to use, and has in fact used, customer securities. (THL Mem. 8.) See Louis Loss & Joel Seligman, VII Securities Regulation 3159 n.119 (2003) (noting that federal securities regulations do not prohibit "a broker-dealer from using a customer's margin securities as collateral to borrow funds to make loans to its other customers").

[17] Defendants contend that Paragraph 1 of the Trade Confirmation, which authorizes RCM "to sell, pledge, hypothecate, assign, invest or use, such collateral or property deposited with it" (Rosen Decl. Ex. A), permitted RCM to sell or otherwise dispose of customer assets in *all* customer accounts, regardless of whether a margin balance existed in the account. (THL Mem. 18; THL Reply Mem. 12-13 n.14.) Although Paragraph 1 contains no explicit reference to margin transactions, Paragraph 6 of the Trade Confirmation provides that all customer transactions with RCM are subject to, *inter alia*, "the terms of the applicable customer agreement." (Rosen Decl. Ex. A.) When read in conjunction with the Customer Agreement, it is clear that the Trade Confirmation simply implements the Customer Agreement's provisions regarding RCM's use of customer securities for those customers with outstanding margin loans. Indeed, the references in Paragraph 1 of the Trade Confirmation to "a first priority, perfected security interest in all of you[r] cash, securities and other property" and RCM's right to "sell, pledge, hypothecate, assign, invest or use, such collateral or property" track virtually identical language contained in Section B of the Customer Agreement, which governs margin transactions. (Compare Rosen Decl. Ex. A with id. Ex. B.) Paragraph 1 also provides that RCM's security interest is "for discharge of obligations," which generally arise only when a customer uses margin financing. (Rosen Decl. Ex. A.) Defendants' interpretation of Paragraph 1 as authorizing RCM to use securities in all customer accounts regardless of the existence of a margin balance is, at the very least, in tension with the Customer Agreement, which only gives explicit authorization for RCM to use customer securities in those accounts with outstanding margin loans, and thus implicitly suggests that RCM is prohibited from using securities in customer accounts where no margin balance exists. See India.Com, Inc. v. Dalal, 412 F.3d 315, 323 (2d Cir. 2005) ("[E]ffect and meaning must be given to every term of the [parties' agreement], and reasonable effort must be made to harmonize all of its terms." (internal

In particular, with one exception discussed below, see infra at 23-25, the only time at which plaintiffs plead with particularity that they had no margin balances is in October 2005, at the point in time when Refco filed for bankruptcy. (Capital Compl. ¶¶ 69, 80, 93; VR Compl. ¶ 110; see Class Compl. ¶ 159.) Plaintiffs argue that RCM's failure to reconvey their securities to them at that time necessarily means that RCM was using their securities in contravention of the parties' understanding pursuant to the Customer Agreement.

Plaintiffs' argument, however, rests on the faulty premise that RCM continued to "use" their securities unless and until RCM physically returned those securities to them. Section B of the Customer Agreement expressly provides that when a margin loan is outstanding, "Refco shall have the right to *loan, pledge, hypothecate or otherwise use or dispose of* [the margin customer's] cash, securities, and other property." (Rosen Decl. Ex. B (emphasis added).) Thus, when RCM "loan[s], pledge[s], hypothecate[s] or otherwise use[s]" a security owned by a customer with an outstanding margin loan, that property has been "dispose[d] of," and RCM's "use" of that security effectively ends after consummation of that transaction. (Id.) Except for one plaintiff in the Capital Management action, none of the plaintiffs alleges that its account had no "margin balance *when the securities were hypothecated and the loans were made* — a margin balance that [would] have made the hypothecation perfectly acceptable under the agreements." (Grant Thornton Reply Mem. 6 (emphasis in original).) Indeed, the Class Complaint

---

quotation marks omitted)). When read together, the only reasonable interpretation of the Customer Agreement and Trade Confirmation is that RCM was authorized to use customer securities only when a margin balance existed in the customer's account. As explained below, however, plaintiffs' claim of deceptive conduct still fails because none of the complaints adequately allege that RCM actually used plaintiffs' securities at a time when no margin balance existed in their accounts.

acknowledges that the Class Plaintiffs engaged in margin transactions (see Class Compl. ¶¶ 99, 130), but contains no specific allegations of when such margin financing occurred. The VR Plaintiffs and two of the three Capital Plaintiffs make wholly unspecific allegations with respect to their margin use, alleging only that they purchased securities on margin "only seldomly" (VR Compl. ¶ 96) or "only rarely" (Capital Compl. ¶¶ 80, 93). The fact that RCM could not reconvey all of plaintiffs' property in October 2005 may be a breach of its contractual obligation to "return" to plaintiffs all of the property in their accounts, but it does not ipso facto make RCM's "use or dispos[al]" of plaintiffs' securities prior to October 2005 *deceptive* because in the absence of any allegation that RCM used their securities at a time when plaintiffs had no outstanding margin loans, RCM's pre-October 2005 disposal of plaintiffs' assets did not violate the parties' understanding under Section B of the Customer Agreement. (Rosen Decl. Ex. B.)

The lone plaintiff that does allege that RCM used its securities at a time when it had no outstanding margin loans is Capital Management Select Fund, Ltd. ("Capital Management"). Specifically, Capital Management alleges that

> [d]uring the period from June 2004 to October 2005, unbeknownst to Capital Management, Capital Management's Lukoil stock was sold by RCM to various third parties, through hypothecations or pursuant to Repos, without Capital Management's knowledge, authorization or consent, in furtherance of the fraudulent scheme.

(Capital Compl. ¶ 75.) Capital Management also alleges that it used margin financing only once, in June 2005, and that it paid off this margin loan by August 2005. (Id. ¶ 68.) As a result, the Capital complaint can be read to allege that from June 2004 to June 2005, and from August 2005 to October 2005, RCM used Capital Management's Lukoil securities, even though Capital Management had no outstanding margin loans during those two time periods.

23

Nevertheless, the Capital complaint still fails to adequately allege deceptive conduct under the heightened pleading requirements of Rule 9(b) because it contains no facts whatsoever to support the bare allegation that RCM used Capital Management's securities "[d]uring the period from June 2004 to October 2005." (Id. ¶ 75.) Indeed, the complaint makes clear that Capital Management opened its account with RCM in June 2004 (id. ¶ 67), and October 2005 is simply when RCM declared bankruptcy (id. ¶ 157). The Capital complaint alleges no other facts to amplify the claim that RCM used Capital Management's Lukoil securities from June 2004 to June 2005 or from August 2005 to October 2005, when Capital Management apparently had no outstanding margin loans. The absence of any such allegations is particularly glaring since Capital Management (as well as other plaintiffs) already possesses the internal Refco records necessary to plead a factually adequate claim. (See Capital Compl. ¶ 1 (describing access to "Refco internal files, including books and records, corporate minutes and employee emails"); VR Compl. ¶ 1 (same).)[18] Capital Management's single, conclusory allegation regarding RCM's

---

[18] Indeed, elsewhere in its complaint, Capital Management alleges that it transferred 2 million American Depositary Receipts ("ADRs") of Lukoil stock to RCM, but that "as of August 31, 2005, RCM's internal books and records demonstrate that RCM was not holding 2,000,000 Lukoil ADRs in safekeeping for Capital Management. Rather, as RCM's internal reports reflect, collectively, RCM customers owned a total of approximately 2,635,000 Lukoil ADRs at that time. Of those 2,635,000 securities, RCM had loaned or sold subject to Repo approximately 2,315,000 to third parties in return for cash." (Capital Compl. ¶ 134.) These allegations are sufficient to show that RCM disposed of at least some of Capital Management's Lukoil ADRs prior to August 31, 2005. However, Capital Management makes no such particularized allegations to support its claim that RCM disposed of its securities from June 2004 to June 2005 or from August 2005 to October 2005. Similarly, the Lead Plaintiffs in the putative class action allege that RCM's "fraudulent sales of [their] securities . . . are evidenced by reports generated during the bankruptcy process that track the percentage of particular securities actually held by RCM in relation to the total of all such securities listed as held in [the Lead Plaintiffs'] RCM account[s]." (Class Compl. ¶¶ 80, 87, 94.) Yet, like Capital Management, the Lead Plaintiffs make no specific allegations regarding the timing or extent of RCM's purported use of their securities.

use of its securities throughout the entire life of its account, unsupported by any additional details regarding any such use during the critical periods when it had no outstanding margin loans, is insufficient to satisfy Rule 9(b)'s heightened pleading standard.  See Parmalat, 383 F. Supp. 2d at 622 (noting that plaintiffs alleging fraud "must specify," *inter alia*, "what deceptive or manipulative acts were performed" and "when the acts were performed").

In sum, plaintiffs' dual claims of deceptive conduct based on the Customer Agreement are without merit because the complaints fail to establish that RCM actually used plaintiffs' securities in a manner that violated the parties' understanding under the Customer Agreement.

b.      Account Statements

Plaintiffs next claim that they were deceived as to what RCM was doing with their securities by the monthly account statements they received from RCM.  According to plaintiffs, when an RCM customer borrowed on margin against securities, the number of securities reported in the customer's account statement under the legend "Security Positions In Your Account" was reduced by the corresponding number of securities posted as collateral.  (P. Mem. 25, citing Class Action Compl. ¶ 130; VR Compl. ¶ 158; Capital Compl. ¶ 126.)  As the customer paid off the margin loan, the statement showed a corresponding increase in the number of securities in "Security Positions In Your Account."  (Id.)  Based on these statements, plaintiffs contend that they were led to believe that once they paid off a margin loan, their securities were maintained safely in their RCM accounts, whereas, in fact, "RCM was using all of its customers' securities for its own purposes, whether or not the customer was trading on margin."  (Id..)

As explained above, however, plaintiffs have not alleged with particularity that RCM used their securities at any time at which plaintiffs had no outstanding margin loans, and nothing

in the account statements suggests otherwise.  To the extent RCM used plaintiffs' securities when plaintiffs had margin balances, moreover, the account statements accurately reflected the debits and credits to plaintiffs' accounts.  The Customer Agreement, as discussed above, explicitly authorized RCM to use "all" of a customer's property — i.e., both collateral and "other [non-collateral] property" — when a margin loan was outstanding in the customer's account. (Rosen Decl. Exs. A & B.)  When RCM designated certain customer property as collateral to secure a margin loan, RCM reduced the number of securities reported under "Security Positions In Your Account" by the number of securities it "deemed to be collateral."  (Rosen Decl. Ex. B.) This reduction reflected RCM's accurate recording of those collateral securities as debits in the customer's account.  When the customer paid off his margin loans, RCM adjusted the account statement to show a corresponding increase in the number of securities in "Security Positions In Your Account," thereby properly recording those securities, which were no longer deemed to be collateral, as credits.

The Customer Agreement also permitted Refco to use a customer's non-collateral property — i.e., customer assets in excess of the value that RCM deemed necessary to secure the customer's margin loan — whenever a margin balance existed in the customer's account. Because those securities were not "deemed to be collateral," RCM had an existing obligation under the Customer Agreement to repay those securities to the margin customer upon demand, but nothing in the Customer Agreement prevented RCM from using those non-collateral securities unless and until the margin loan was repaid.[19]  (Rosen Decl. Ex. B.)  Although

---

[19] Indeed, as noted above, the Customer Agreement explicitly disclosed that RCM had "a first priority, perfected security interest in *all* of [a margin customer's] cash, securities and other property," and specifically authorized RCM "to loan, pledge, hypothecate or otherwise use or

plaintiffs complain that RCM's sales of their non-collateral property were not properly disclosed on their account statements, those sales, as previously explained, were made for RCM's *own* use and benefit, and thus were properly not recorded as debits on plaintiffs' account statements.[20] Because RCM had an existing obligation to return to plaintiffs any property that was "not deemed to be collateral," the account statements correctly listed plaintiffs' non-collateral securities as credits that RCM had to repay upon demand, even if RCM had already physically "dispose[d] of" the particular securities that had been deposited with it.[21] (Rosen Decl. Ex. B.)

Contrary to plaintiffs' claims, then, nothing in the account statements was misleading or deceptive as RCM properly recorded the debits and credits in its plaintiffs' accounts. Accordingly, the account statements provide no basis for plaintiffs' Rule 10b-5 claims.

---

dispose of *such cash, securities, and other property* free from any claim or right" until the customer repaid the margin loan. (Rosen Decl. Ex. B (emphasis added).)

[20] Defendants analogize RCM's use of plaintiffs' non-collateral securities to that of a bank using funds deposited with it to make loans to other customers. See Levitin v. PaineWebber, Inc., 159 F.3d 698, 701 (2d Cir. 1998) ("[T]he practice of a financial institution using money deposited with it to obtain earnings is neither unknown nor unexpected, much less nefarious. That is precisely how banks make money."). Plaintiffs contend that the analogy to a bank is inapposite because, *inter alia*, "it is perfectly legal, and expected, for banks to use customer deposits of cash to make money by making loans," whereas, "it is plainly illegal for a broker-dealer to use fully paid customer securities . . . to make money by loaning those securities." (P. Mem. 35-36.) Although plaintiffs may be correct that RCM's conduct violated SEC regulations prohibiting broker-dealers from using "excess margin securities," see infra at note 26, as explained below, "violation of an [SEC] rule does not establish securities fraud in the civil context." United States v. Finnerty, 533 F.3d 143, 151 (2d Cir. 2008).

[21] Section B of the Customer Agreement provided that Refco had an "obligation" to "return" to the customer "cash" or "like amounts of similar cash, securities and other property." (Rosen Decl. Ex. B.) Thus, even if RCM had physically disposed of the particular securities that had been deposited with it by customers, RCM could satisfy its contractual obligations by purchasing "like amounts of similar . . . securities" on the open market and conveying those securities to customers.

27

c.    Trade Confirmation

Plaintiffs point to various provisions of the Trade Confirmation to support their

contention that they were led "to believe that their securities were held in their accounts." (P.

Mem. 26.) In particular, plaintiffs cite language in the third paragraph of the Trade Confirmation

stating that RCM could use customer securities "as may be deemed necessary for margin or to

satisfy or reduce any deficit or debit balance." (Rosen Decl. Ex. A.) Similar to their

interpretation of the Customer Agreement, plaintiffs contend that this language precluded RCM

from (1) using customer securities in excess of the value of a customer's margin balance, and (2)

using customer securities when no margin balance existed in the customer's account. (P. Mem.

26.) When read in its entirety, however, it is clear that Paragraph 3 of the Trade Confirmation

deals only with "cross-margining" — that is, "the right of Refco entities to 'transfer [customer

property]' from a customer's account at one Refco entity to that customer's account at another

Refco entity to the extent necessary to satisfy the margin requirements or debits in the

customer's Refco accounts."[22] (THL Reply Mem. 12, quoting Rosen Decl. Ex. A). Plaintiffs'

reference to Paragraph 3 of the Trade Confirmation is thus inapposite as that paragraph contains

no representation whatsoever concerning RCM's ability to use customer assets.

---

[22] Paragraph 3 of the Trade Confirmation provides:

> Refco Entities may in their discretion, without prior notice to you,
> apply or transfer any cash, securities or other property
> interchangeably between any of your accounts at any Refco Entity,
> as may be deemed necessary for margin or to satisfy or reduce any
> deficit or debit balance in any such account.

(Rosen Decl. Ex. A.)

Plaintiffs' remaining argument is that Paragraph 4 of the Trade Confirmation refers several times to RCM as maintaining "custodian" accounts, thereby purportedly "reinforcing customers' beliefs that their securities were being held in custody" rather than being used by RCM. (P. Mem. 26-27.) As defendants point out, however, Paragraph 4 does not state that RCM maintained "custodian" accounts for its customers; rather, it states that a third party, such as "a bank, broker, or other custodian," might be "utilized by RCM" to act as a custodian of customer assets.[23] (THL Mem. 12 n.13.) In any event, to the extent that the "custodian" language in Paragraph 4 gave plaintiffs an amorphous impression that RCM would not use their assets, that understanding was eviscerated by the explicit language in both Paragraph 1 of the Trade Confirmation and Section B of the Customer Agreement, which specifically disclosed to plaintiffs that RCM had a security interest in "all" of their property and authorized RCM to sell, use, or otherwise dispose of such property whenever a margin balance existed in their accounts. (Rosen Decl. Exs. A & B.) Given this express language in both the Trade Confirmation and the Customer Agreement, plaintiffs' arguments regarding the purported misrepresentations in the Trade Confirmation are unavailing.

---

[23] Paragraph 4 of the Trade Confirmation provides:

> RCM shall not be responsible for the loss or destruction of any property held by RCM for your account in the custody of a bank, broker or other custodian, or which is lost or destroyed as a result of war, civil commotion, enemy action, governmental action or any other cause beyond the reasonable control of RCM, or any custodian utilized by RCM.

(Rosen Decl. Ex. A.)

d.     <u>Lack of Compensation for Risk</u>

_____Plaintiffs further suggest that RCM's failure to pay compensation to them for using their securities was itself communicative conduct that gave rise to a false impression that RCM was not actually using their fully-paid customer securities.[24]  Plaintiffs' theory appears to be that since "[n]o rational customer, aware of the risk to which RCM was exposing its securities, would have entrusted fully-paid securities to RCM when such customer received absolutely no benefit for doing so," RCM's failure to pay any interest or other compensation to customers for their fully-paid securities misled customers into thinking that RCM was not, in fact, disposing of their securities.  (P. Mem. 28.)

Preliminarily, plaintiffs' premise that RCM's failure to pay compensation suggested that it would not use customers' fully-paid securities is belied by the fact that broker-dealers often use customer funds without passing on the interest to customers.  <u>See</u> <u>Levitin v. PaineWebber, Inc.</u>, 159 F.3d 698, 701 (2d Cir. 1998) ("Inasmuch as no NYSE or Commission rule prohibits or explicitly mandates the payment of interest on customer credit balances and monies generated from the lending of customer securities, the payment of such interest <i>is a matter for negotiation</i> between the customer and the broker-dealer."  (emphasis added) (internal quotation marks omitted)).  In an analogous context, the Second Circuit has recognized that "[s]ome bank accounts are not interest-bearing — <u>e.g.</u>, most checking accounts — even though the balances in such accounts are used by banks to earn money."  <u>Id</u>. at 703.  In addition, even if RCM's failure

_____

[24] "Fully paid securities result primarily when a customer deposits securities with a broker for safekeeping, purchases securities and authorizes a broker to hold them in street name pending future disposition, or pays for securities not yet delivered."  Loss & Seligman, VII <u>Securities Regulation</u> 3159 n.117 (internal quotation marks omitted).

to pay interest to plaintiffs somehow gave them a subjective impression that RCM would not touch their fully-paid securities, the Customer Agreement and the Trade Confirmation expressly disclosed the terms by which RCM could use customer securities and specifically permitted RCM to use both securities held as collateral and fully-paid, non-collateral securities as long as that customer had outstanding margin loans. See supra at 19-21 & n.17. In light of this express disclosure in the operative contractual documents between RCM and plaintiffs, RCM's failure to pay compensation to its customers for using their securities is simply insufficient to give rise to a reasonable understanding among the parties that RCM would not use plaintiffs' securities when they had outstanding margin loans.

e.    Oral Representations

Plaintiffs' claim of deceptive conduct based on purported oral representations made by Refco employees similarly fails. In their opposition brief, the Lead Plaintiffs in the putative class action allege that Serge Pushinsky, a Refco representative who handled their accounts, "misrepresented that RCM held as custodian the property entrusted to it by Plaintiffs." (P. Mem. 29.) The Class complaint itself, however, contains only the bare-bones allegation that "Refco represented to [the Lead Plaintiffs] that [their] securities were safe at Refco" and fails to describe the alleged misrepresentation by Pushinsky (or any other Refco employee) with any greater specificity. (Class Compl. ¶¶ 76, 83, 90.) The alleged representation by an unidentified Refco employee that plaintiffs' "securities were safe at Refco" is simply not a representation about whether customer securities could be used by RCM, let alone a representation sufficient to satisfy the pleading requirements of Rule 9(b). (THL Mem. 21.) See Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (noting that a complaint making fraud allegations must "(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent" (internal quotation marks omitted)).

The Capital Plaintiffs' allegations regarding Refco's oral representations are likewise deficient. Their complaint alleges that "Refco repeatedly represented during the course of the brokerage relationship that the securities in [the Capital Plaintiffs'] account[s] belonged to [them]." (Capital Compl. ¶¶ 72, 83, 95). This representation, however, goes to the ownership of the securities in the Capital Plaintiffs' accounts, rather than the terms by which RCM could use those securities. The Capital Plaintiffs also allege "other representations made in the course of [their] course of dealings with Refco" (id. ¶¶ 70, 81) and "dealings and discussions with Refco and its representatives" (id. ¶ 91), but they never specify the content of these "other representations" or statements by Refco in any "dealings and discussions." Instead, the bulk of the Capital Plaintiffs' allegations center on what they represented *to* Refco, and even allege internal Refco communications that clearly were not representations of any kind by Refco *to* the Capital Plaintiffs. (See, e.g., id. ¶ 66 (describing "email communication between representatives of Refco and RCM" following meeting with Capital Management); id. ¶ 77 (recounting IDF's representations to Refco during initial meetings).)

The VR Plaintiffs also allege numerous oral representations made by Refco employees to them concerning Refco's brokerage business, but again, these representations do not concern RCM's use of customer assets. In particular, the VR Plaintiffs allege that Refco representative Adam Weiss stated to them that "Refco's business model [w]as a riskless one, in which Refco simply executed, cleared and financed customer trades in exchange for commissions, spreads

and interest payments." (VR Compl. ¶ 85.)  Nothing in Weiss's statement, however, constitutes any specific representation about whether, when, and/or to what extent, RCM could use the VR Plaintiffs' securities.  Weiss's comment that Refco's business model was "riskless" is fairly characterized as mere sales hyperbole and cannot reasonably be construed by sophisticated institutional investors such as the VR Plaintiffs to mean that they took no risks in dealing with Refco.  In fact, the allegations in the VR complaint reveal that RCM actually put the VR Plaintiffs on notice that it would use margin customers' securities to enter transactions with third parties.[25]

In sum, Refco's oral representations to plaintiffs cannot give rise to a deceptive conduct claim because none of the purported representations are sufficiently relevant or specific to have created an understanding regarding RCM's use of customer securities that differed from, or was inconsistent with, the terms of the Customer Agreement and the Trade Confirmation.

f.　　Violation of Federal Law

Plaintiffs finally argue that RCM's use of their securities was deceptive because it violated federal law, in particular, the net capital and segregation requirements of SEC Rules

---

[25] As alleged in the VR complaint, Weiss explained to the VR Plaintiffs that "Refco would lend money to one party in exchange for securities as collateral *and then simultaneously conduct an equal and opposite transaction with a third-party*."  (VR Compl. ¶ 86 (emphasis added).)  Thus, contrary to the VR Plaintiffs' claim that they were unaware that RCM would use customer securities (see, e.g., id. ¶ 104), Weiss explicitly disclosed to the VR Plaintiffs that in the ordinary course of business, RCM would routinely use customer securities held as collateral to enter into transactions with third parties.  (THL Reply Mem. 4 n.2)  See Hirsch, 72 F.3d at 1092 ("General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint.").

15c3-1 and 15c3-3.  See 17 C.F.R. § 240.15c3-1; id. § 240.15c3-3.[26]  Plaintiffs contend that RCM and defendants deceived them by not disclosing that RCM was violating these broker-dealer rules and not properly protecting customer assets.

The Second Circuit's recent decision in United States v. Finnerty, 533 F.3d 143 (2d Cir. 2008), however, squarely forecloses plaintiffs' argument.  The defendant in Finnerty was a "specialist" broker with the New York Stock Exchange ("NYSE") who was accused of defrauding his customers by engaging in "interpositioning," a practice prohibited by NYSE rules.  The Court of Appeals held that to be held liable under § 10(b) and Rule 10b-5, Finnerty must actually have made a representation regarding his compliance with the NYSE rule against interpositioning, and that Finnerty's mere breach of the rule did not ipso facto give rise to fraud liability.  Id. at 149-50.  According to Finnerty, the NYSE rule against interpositioning may have led some customers to understand that the NYSE rules prohibit specialists from interpositioning and "some customers may have expected that Finnerty would not engage in the practice[,] [b]ut unless [the customers'] understanding *was based on a statement or conduct by Finnerty*, he did not commit a primary violation of § 10(b)."  Id. at 150 (emphasis added).

---

[26] Among other things, "Rule 15c3-1 requires broker-dealers to maintain sufficient capital to operate safely, and Rule 15c3-3 requires broker-dealers to protect and segregate certain customer funds and securities."  (P. Mem. 31-32.)  In particular, Rule 15c3-3 prohibits broker-dealers from using customers' "excess margin securities," defined as "securities whose market value in the customer's general account exceeds 140 percent of the customer's debit balance (that is, the amount the customer owes to the broker)."  Loss & Seligman, VII Securities Regulation 3159 n.119 ("Rule 15c3-3 does not prevent a broker-dealer from using a customer's margin securities as collateral to borrow funds to make loans to its other customers.  The Rule does, however, preclude this type of hypothecation of 'excess margin securities.'").  In addition, Rule 15c3-3 "makes it unlawful for a broker-dealer to accept or use customer funds to finance any part of its proprietary business activities."  Id. at 3169 (internal quotation marks omitted).

Here, even assuming *arguendo* that RCM was required to comply with federal securities regulations and that RCM, in fact, violated those regulations (both of which are vigorously contested by defendants), nowhere in their complaints do plaintiffs allege that RCM (or any other Refco affiliate or employee) made any representation that it was subject to, or would comply with, any such regulations, much less the specific segregation and net capital requirements cited by plaintiffs.[27]  Given the Second Circuit's rejection of the argument that securities fraud liability can be based on "background assumption of compliance" with securities regulations, id. at 149, plaintiffs' allegation that they had "every reason to believe" that RCM was subject to and would comply with Rules 15c3-1 and 15c3-3 (P. Mem. 34) is simply insufficient to hold RCM liable for a violation of § 10(b) and Rule 10b-5.  Accordingly, even if RCM violated federal securities regulations by using customer assets to make loans to Refco affiliates, plaintiffs may not rely on those violations to establish deceptive conduct because "violation of an [SEC] rule does not establish securities fraud in the civil context."  Finnerty, 533 F.3d at 151.

---

[27] Plaintiffs point to language in the Trade Confirmation stating that RCM was subject to "all applicable laws, rules, practices, and customs."  (Ltr. from Scott A. Edelman to the Court, Aug. 6, 2008, quoting Rosen Decl. Ex. A.).  As an initial matter, however, the inclusion of the word "applicable" simply begs the question of what laws and regulations apply to RCM, which contends that it was an unregulated "Bermuda corporation."  (Rosen Decl. Ex. A.)  More fundamentally, such boilerplate language regarding "all applicable laws" is simply too vague and unspecific to constitute a representation that RCM would be subject to the net capital and segregation rules at issue here.  Plaintiffs also cite to a provision in the Customer Agreement stating that "[t]his Agreement shall be governed by and construed with New York law," (Rosen Decl. Ex. B), but that provision — which governs the Customer Agreement itself — is simply a choice of law provision and in no way constitutes a representation that RCM's brokerage activities were subject to federal regulation, let alone that RCM would comply with SEC regulations.

In sum, "[b]road as the concept of 'deception' may be, it irreducibly entails some act [or representation] that gives the victim a false impression." Id. at 148. None of the grounds advanced by plaintiffs, either individually or taken together, suffices to establish any affirmative misrepresentation or act that gave plaintiffs a false understanding concerning RCM's use of their assets. Accordingly, plaintiffs have failed to plead their Rule 10b-5 claims on a theory of affirmative deception.

2.    Fiduciary Duty

Having failed to adequately plead affirmative deception, plaintiffs alternatively base their Rule 10b-5 claims on the theory that RCM owed them a fiduciary duty. As the Court explained in RCM I:

> Another kind of securities fraud claim is based on conduct that is deceptive because it is inconsistent with a fiduciary duty. In claims of this kind, the fiduciary duty serves as a sort of standing false representation by the fraudster, who deceives the victim by violating the commitment associated with her fiduciary duty. Acceptance of a fiduciary duty creates an understanding that the fiduciary will behave in certain ways; if the fiduciary allows this understanding to continue while acting inconsistently with her obligations, she has deceived the victim.

2007 WL 2694469, at *7. Plaintiffs urge that even in the absence of affirmative acts or misrepresentations, RCM nevertheless engaged in deceptive conduct by failing to disclose that it used customer assets to fund Refco affiliates in breach of the fiduciary duty it owed to plaintiffs. (P. Mem. 37.)

Under New York law, however, it is well established that

> the mere existence of a broker-customer relationship is not proof of its fiduciary character. The fiduciary obligation between a broker and customer under New York law is limited to affairs entrusted to the broker, and the scope of affairs entrusted to a

36

> broker is generally limited to the completion of a transaction. In
> the absence of discretionary trading authority delegated by the
> customer to the broker . . . a broker does not owe a general
> fiduciary duty to his client.

Bissell v. Merrill Lynch & Co., Inc., 937 F. Supp. 237, 246 (S.D.N.Y. 1996) (internal quotation

marks, alterations, and citations omitted); see Press v. Chem. Inv. Servs. Corp., 166 F.3d 529,

536 (2d Cir. 1999) (observing that "in the context of an ordinary broker-client relationship, the

broker owes no fiduciary duty to the purchaser of the security"). As noted above, Section A of

the Customer Agreement provides that plaintiffs' accounts at RCM were non-discretionary, and

thus RCM owed no "general fiduciary duty" to plaintiffs. Bissell, 937 F. Supp. at 246. The

complaints also do not allege any failure by RCM to effectuate any transactions on plaintiffs'

behalf, and thus RCM did not violate its "limited" fiduciary duty to execute customer-directed

transactions. Id.; see De Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293, 1306 (2d Cir.

2002) ("[I]n establishing a nondiscretionary account, the parties ordinarily agree and understand

that the broker has narrowly defined duties that begin and end with each transaction.").[28]

With regard to RCM's use of plaintiffs' securities, as explained above, the allegations in

the complaints are insufficient to establish that RCM used plaintiffs' securities when they did not

have outstanding margin loans. To the extent RCM used plaintiffs' securities when plaintiffs did

---

[28] Plaintiffs argue that Judge Drain in the bankruptcy proceedings found that RCM owed
a fiduciary duty to RCM customers in the course of ruling that the customers "entrusted"
securities to RCM. (P. Mem. 40-41.) As defendants persuasively contend, however, Judge
Drain held that RCM was a fiduciary to its customers only with respect to executing customer
trades, and plaintiffs make no claim that RCM failed to execute transactions for their accounts in
accordance with their instructions. See Rosen Decl. Ex. C., at 249:12-18 (noting that for a
broker to "be a fiduciary to its customer . . . is largely redundant or overlaps with the notion that
the customer entrusts its securities with the broker *to effectuate a transaction*, because . . . *it's in
that context* that a broker becomes a fiduciary; that is, *in completing the securities transaction
that the customer has asked*" (emphasis added)).

have margin balances in their accounts, the Second Circuit has held that "customers with margin accounts" have "the status of general creditors." Levitin, 159 F.3d at 706. Similarly, "[t]he SEC has also recognized that the relationship of brokers to customers with respect to credit and debit balances in their accounts *is that of debtor and creditor*." Bissell, 937 F. Supp. at 246. In Bissell, the court ruled that a broker-dealer who "uses its customers' assets, in the form of cash and stock collateral and proceeds of short sales, to earn interest and to obtain other financial benefits without notifying the customer of this practice or sharing the proceeds with them," id. at 241, acts only as a "creditor," and thus "has no fiduciary obligations" to its customers in connection with its use of customer assets, id. at 247; see id. at 246 (observing that "[w]hile a broker and a customer have an agent-principal relationship with respect to each transaction to buy or sell, they may also have a separate and distinct relationship as creditor and debtor" (internal quotation marks omitted)). Accordingly, to the extent that RCM used plaintiffs' assets when plaintiffs had outstanding margin loans, such conduct created only a creditor-debtor relationship, not a fiduciary one.

For the reasons stated above, then, plaintiffs have failed to remedy the fundamental defect identified in RCM I as none of the complaints adequately alleges that RCM engaged in deceptive conduct through affirmative acts or misrepresentations, breach of a fiduciary duty, or any other manner. Accordingly, even if plaintiffs could establish standing to bring their Rule 10b-5 claims — which, as explained above, they cannot — plaintiffs' failure to allege deception, in any event, would require dismissal of those claims.

## II.     Rule 10b-16 Claims

The same result applies to plaintiffs' Rule 10b-16 claims against the Officer

Defendants.[29]  As an initial matter, it is not entirely clear whether private parties such as

plaintiffs may even bring an action to enforce Rule 10b-16.  The text of the rule itself does not

contain an express cause of action, see 17 C.F.R. § 240.10b-16, and the Second Circuit has not

yet decided whether an implied right of action exists.  See Zerman v. Ball, 735 F.2d 15, 23 (2d

Cir. 1984).  Other circuits and district courts within this circuit have recognized an implied right

of action under Rule 10b-16, see, e.g., Angelastro v. Prudential-Bache Secs., Inc., 764 F.2d 939,

949-50 (3d Cir. 1985); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 539 (9th Cir.

1984); Liang v. Dean Witter & Co., 540 F.2d 1107, 1113 n.25 (D.C. Cir. 1976), Metzner v. D.H.

Blair & Co., 689 F. Supp. 262, 267 (S.D.N.Y. 1988); Slomiak v. Bear Stearns & Co., 597 F.

Supp. 676, 681 (S.D.N.Y. 1984), but as defendants note, these cases were decided prior to recent

Supreme Court and Second Circuit decisions that have taken a more restrictive view towards

implying private rights of action, see e.g., Alexander v. Sandoval, 532 U.S. 275, 286 (2001)

("Like substantive federal law itself, private rights of action to enforce federal law must be

created by Congress."); Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 116 (2d Cir. 2007);

Olmstead v. Pruco Life Ins. Co., 283 F.3d 429, 432 (2d Cir. 2002); see also Stoneridge Inv.

Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 773 (2008) (observing that the "§ 10(b)

private right should not be extended beyond its present boundaries").

---

[29] Rule 10b-16 "makes it unlawful for a broker to extend credit to a customer in connection with a securities margin transaction without disclosing to the customer the terms and conditions by which costs of credit will be imposed."  Komanoff v. Mabon, Nugent & Co., 884 F. Supp. 848, 858 (S.D.N.Y. 1995); see 17 C.F.R. § 240.10b-16.

It is unnecessary to decide here whether a private right of action under Rule 10b-16 exists because, even assuming *arguendo* that it does, plaintiffs' failure to allege deception requires dismissal of those claims.[30]  "As with the other SEC regulations promulgated under section 10(b) of the 1934 Act, . . . a cause of action for violation of Rule 10b-16 can only be maintained where the claim stems from the enabling statute's prohibition of the use of *deceptive or manipulative devices* in connection with the purchase or sale of securities."  Bissell, 937 F. Supp. at 244 (emphasis added) (internal quotation marks omitted).  The plaintiffs' failure adequately to plead deception is even more apparent in connection with their Rule 10b-16 claims that it was with respect to their claims under Rule 10b-5.  Unlike Rule 10b-5, which functions as a general, catch-all antifraud provision, Rule 10b-16 is much narrower in scope and focuses specifically on the broker's disclosure of the terms of credit.  Thus, in contrast to plaintiffs' wide-ranging allegations of deception in connection with their Rule 10b-5 claims, which create a least a colorable impression of wrongdoing, plaintiffs' claims under Rule 10b-16 are considerably more limited, alleging only that the Officer Defendants failed to provide them with (1) a written statement disclosing the nature of any interest or lien that RCM had in collateral posted by plaintiffs, and (2) statements, at least quarterly, showing the debits and credits in plaintiffs' accounts.  (VR Compl. ¶ 163; Capital Compl. ¶ 138; Class Compl. ¶135.)

_____

[30] For the same reason, it is also unnecessary to decide whether the purchaser-seller rule deprives plaintiffs of standing to bring their Rule 10b-16 claims.  None of the parties addresses the "purchaser or seller" standing rule in connection with plaintiffs' Rule 10b-16 claims, and it is unclear whether that rule even applies in the Rule 10b-16 context.  Although the SEC promulgated Rule 10b-16 under § 10(b) of the Securities Exchange Act of 1934, see Bissell, 937 F. Supp. at 244, the Supreme Court's decision in Blue Chip Stamps adopting the purchaser-seller rule "purported to define the scope of a private right of action under Rule 10b-5" rather than "to define the words 'in connection with the purchase or sale'" under § 10(b) of the Exchange Act, Dabit, 547 U.S. at 84.

As explained above, however, the Customer Agreement expressly disclosed that when plaintiffs engaged in margin loans, RCM held "a first priority, perfected security interest in all of [their] cash, securities and other property" and was entitled to "loan, pledge, hypothecate or otherwise use or dispose of such cash, securities and other property free from any claim of right" until the margin loan was settled. (Rosen Decl. Ex. B.) RCM also provided monthly statements to each of the plaintiffs accurately recording the debits and credits in their accounts. See supra at 25-27. To make out a claim under Rule 10b-16, plaintiffs must allege that they were deceived specifically about the terms and conditions of their credit arrangement. But as concluded above, whatever else RCM may have done, its communications to customers plainly set forth the terms of the margin loans, including RCM's right to use all of the securities its margin customers pending settlement of the margin loans. Plaintiffs have thus failed to allege any violation of Rule 10b-16, let alone deceptive conduct that, assuming *arguendo* that a private right of action exists, would enable them to bring a cause of action to enforce Rule 10b-16. The failure to allege deception is thus fatal to their Rule 10b-16 claims, which must therefore be dismissed.

## III.    Section 20(a) Claims

Because plaintiffs lack standing to bring a claim against any defendant for a primary violation of § 10(b) and Rules 10b-5 and 10b-16, plaintiffs necessarily lack standing to bring their § 20(a) control liability claims against the THL Defendants and the Officer Defendants. See Kaplan v. Utilicorp United, Inc., 9 F.3d 405, 408 (5th Cir. 1993). Even if plaintiffs could establish standing, moreover, their failure to allege deception, a prerequisite for a finding of a primary violation under Rules 10b-5 and 10b-16, would require dismissal of their § 20(a) claims in any event. See  Komanoff v. Mabon, Nugent & Co., 884 F. Supp. 848, 858 n.16 (S.D.N.Y.

1995); <u>Brown v. Hutton Group</u>, 795 F. Supp. 1317, 1324 (S.D.N.Y. 1992) ("[I]t is impossible to state a claim for secondary liability under Section 20 without first stating a claim for some primary violation of the security laws on the part of the controlled party.").

## IV.     Leave to Replead

Under Rule 15 of the Federal Rules of Civil Procedure, a party generally "may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Although "[l]eave to amend should be freely granted, . . . the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." <u>Jin v. Metro. Life Ins. Co.</u>, 310 F.3d 84, 101 (2d Cir. 2002). The Class Plaintiffs had the benefit of filing their Second Amended Complaint after the Court's extensive Opinion and Order in <u>RCM I</u> detailing the deficiencies in their original pleading. Having already had two bites at the apple, the Class Plaintiffs will not be granted a third. <u>See</u> <u>Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.</u>, 85 F. Supp. 2d 282, 304 n.27 (S.D.N.Y. 2000) ("Leave to amend is appropriately denied where, as here, the plaintiff has already had an opportunity to replead after specific warnings as to a complaint's deficiencies").

Although the VR and Capital Plaintiffs have not previously sought leave to amend, they too had the benefit of filing their complaints after the Court's decision in <u>RCM I</u>. Unlike the Class Plaintiffs, moreover, they also had access to "Refco's internal files, including books and records, corporate minutes and employee emails" (VR Compl. ¶ 1(c); Capital Compl. ¶ 1(c)), presumably because their counsel previously represented the Refco Creditors Committee and presently represents Marc Kirschner as Trustee of the Refco Litigation Trust (Murphy & Sexton

Reply Mem. 14). Yet even with the guidance provided by the Court in RCM I and their access to a gold mine of data and documents, the VR and Capital Plaintiffs have failed to plead adequate claims for securities fraud.

None of the plaintiffs has provided the Court with "any indication of what additional facts [they] would allege if permitted to amend." 2 Broadway L.L.C. v. Credit Suisse First Boston Mortg. Capital L.L.C., No. 00 Civ. 5773, 2001 WL 410074, at *13 (S.D.N.Y. Apr. 23, 2001). Indeed, plaintiffs' request for leave to replead consists of a mere two-page appendage tacked onto their 125-page opposition brief, and in those two pages, plaintiffs essentially ask for an open-ended leave to replead. Without any idea of what additional facts plaintiffs would allege if permitted to replead, this Court simply cannot determine whether any amendment to their pleadings would be in the interest of justice. Accordingly, plaintiffs' request for leave to replead is denied.

## CONCLUSION

For the foregoing reasons, the motions to dismiss by defendants Tone N. Grant, Philip Silverman, Robert C. Trosten, Richard N. Outridge, Joseph J. Murphy, William M. Sexton, Grant Thornton LLP, and the THL Defendants are granted. Plaintiffs' request for leave to replead is denied.

SO ORDERED.

Dated: New York, New York
August 28, 2008

GERARD E. LYNCH
United States District Judge

43